CONTINENTAL TRUST CO. OF NEW YORK v. TOLEDO, ST. L. & K. C. R. CO.

(Circuit Court, N. D. Ohio, W. D.    January 26, 1894.)

No. 1,205.

1. RECEIVERS—CONTROL BY COURT—COMPLAINTS OF EMPLOYES—PROCEDURE.
   Employes of a receiver alleging grievances against him may be heard by the court upon making proper application therefor, and if it is of opinion that the allegations demand further investigation it will order the receiver to answer the same, and from these pleadings will determine whether the issue is one requiring a formal investigation by the taking of evidence.

2. SAME—DISCRETION—ADMINISTRATIVE DETAILS.
   When the court appoints a receiver to carry on a business, it necessarily commits to his discretion the management of all administrative details relating thereto, and will not interfere therewith unless an abuse of discretion is made to appear.

3. SAME—COMPLAINTS OF EMPLOYES—REMEDY.
   Upon complaint by the employes of a railroad receiver in respect to a reduction of their wages, the court will not interfere to reverse the receiver's administration by settling the details of the complaints, involving, as this would, an extensive investigation of administrative details, but if an abuse of discretion is made manifest, will select a new receiver, to whom such matters may more satisfactorily be intrusted.

In Equity.    Railroad foreclosure suit.    On petition of certain employes complaining of a reduction of wages by the receiver, and asking relief in respect thereto.    Refused, and petition dismissed.

Statement by RICKS, District Judge:

An application has been filed in this case by counsel, who represent a committee of three conductors, three engineers, two brakemen, two firemen, and one telegrapher, now in the employ of the receiver, in which they ask the court to order the receiver to set aside the schedule of wages promulgated by him to take effect November 1, 1893, and offering to produce testimony to show that there was no necessity on the part of the receiver for reducing the wages named in that schedule.

The petition avers, that at the time of the appointment of the receiver they were working under a schedule of wages which was satisfactory to the petitioners and the men whom they represent.    That on June 23, 1893, a schedule was made by the superintendent for the receiver, and a committee acting for the petitioners, which contained the following provision: "No part of this agreement will be abrogated by either party without 30 days' notice, and then only after consultation of all interested."    That the schedule existing prior to the appointment of the receiver contained a similar provision, which was not observed.    That wages were arbitrarily reduced from the schedule of June, 1893, without notice, and on plea of the receiver of a great decrease in the earnings of the road.    The petitioners claim that if the earnings had decreased, and the expenses were too high, a reduction should be made in all departments alike; that men who received from $150 to $1,000 per month, and lived in luxuriant quarters, should be reduced in the same proportion as those who labor, and are exposed to privations and dangers. The petition further contains a statement as to the wages of engineers and other employes, to show that they are not receiving sufficient to maintain their families in a respectable manner.

The petition thereupon proceeds to suggest several ways in which the expenses might be greatly reduced, the force of men lessened in various departments, and how wages might be apportioned so as to make the reduction contemplated by the schedule of November, 1893, unnecessary.

Upon the filing of this application, by leave of court, the receiver was requested to file his answer thereto, which he did on the 1st of January, 1894. In that answer the receiver avers that, as president and general manager, before his appointment as receiver, the salaries of his employes were increased at different times; that long prior to his appointment as receiver the business of the road would have justified a substantial reduction of wages, but, hoping for an increase of the earnings in the spring and summer of 1893, as president of the road, he was unwilling to do so. Owing to this leniency and unwillingness to reduce the wages, a debt was created, which the company was unable to pay. In June, 1893, while the crop outlook was so promising, and when a revival of business seemed assured, the receiver made a schedule, which was not, in fact, a general reduction of wages; but the earnings of the months of July, August, and September did not fulfill the promise of June. Between the 1st of July, 1893, and the 23d of December, 1893, the earnings of the road decreased $365,194.51 over the corresponding period for 1892. This amounted to a decrease of over 30 per cent., or at the rate of $2,000 per day. Soon after June, 1893, a general reduction in expenses was made in every department. The reduction of wages was the last step taken to meet the still increasing deficiency. This reduction in wages was general, though not uniform. The percentage varied, because "economy has been secured by dispensing with the services of certain employes, reducing payment for a given work, increasing the amount of work of different employes without corresponding increase in compensation, and by varying the percentage of reduction in proportion to the compensation paid, those receiving the lowest wages being reduced the least."

The answer further avers that the total number of employes under the receiver amounted to about 1,300, about 900 of whom accepted the reduction, and about 400 of whom objected. As a rule, the answer avers, the reduction of the 900 who accepted is greater than that of the 400 who objected.

The answer further avers that railroads of greater earning capacity, extending through the same region, are paying substantially less wages. "That the average daily wages of conductors, brakemen, engineers, and firemen fixed by the receiver's schedule of November 1, 1893, and which the petitioners seek to have abrogated by the orders of this court, are higher than the average daily wages paid under schedules of 20 other railroads in the same territory through which the railroad operated by your receiver runs, such railroads being roads entering St. Louis or Toledo, or railroads crossed by the line operated by your receiver. The average wages fixed by your receiver's schedule aforesaid for the classes of employes above named are higher than the average wages paid like employes by the Pennsylvania Railroad Company, the Lake Shore & Michigan Southern Railway Company, the Michigan Central Railroad Company, the Lake Erie & Western Railroad Company, the Cleveland, Cincinnati, Chicago & St. Louis (Big Four) Railroad Company, and others in the same general territory."

The receiver denies that the schedule of June, 1893, was abrogated without notice to the committee, but avers that they had full notice of the proposal to reduce, and that negotiations followed such notice.

The answer further avers that the committee has not proposed, in such form as to be open to negotiations, any schedule which would be acceptable to them. They suggested an arbitrary percentage reduction, but reductions had already been made in other departments, and such a reduction operates inequitably towards those receiving the lowest wages.

The answer further avers that the committee suggested that a specified amount should be deducted from the wages of specified individuals, and continue for a limited period. For the reason that the decrease in earnings was continuing, and for the further reason that no such reduction had been made in any other department than those represented by the committee, the receiver says he was of the opinion that such reduction would, under the terms and conditions suggested, be inequitable.

The answer, referring to the wages of engineers as stated in the petition, claims that said wages are not correctly represented; that the result was reached "by dividing the aggregate amount paid the entire number who worked any part of a month by the whole number so employed, whereas, for the purpose of a just ascertainment of the amount of the average wages of such classes of employes paid during any month, the aggregate amount so paid should be divided by the whole number working an entire month. During the months specified in said application many of such employes were idle for greater or less time, either of their own accord, or because of an insufficient amount of work to keep them constantly engaged. Should the average monthly wages be ascertained by the per month computation, as aforesaid, the same would be found to be greatly in excess of the amounts given in petitioners' application."

In reply to the averments of the petition that the wages received "amount to almost expulsion from the service, or the acceptance of a condition of pauperism," and under which they say they cannot make "an honorable and comfortable living," the receiver answers and says that the November pay roll shows that 26 engineers drew between $100 and $160 for the month; that 17 conductors drew from $100 to $115 for the month; that 43 firemen drew from $50 to $90 for the month; and that 73 brakemen drew from $50 to $80 for the month.

The receiver "respectfully suggests, in view of the condition and earnings of the property under his control, and particularly in view of the general depression now prevailing, whether it can be fairly said that the petitioners are reduced to 'a condition of pauperism,' or deprived of the means of earning 'an honorable living.'"

The answer further admits that certain individuals of the classes of employes claimed to be represented by the petitioners received less than the amounts above stated, but the receiver avers that was not due to the rate of wages fixed by the schedule, but was due to the fact that, owing to the insufficiency of business, or from some other cause, such employes were at work less than full time during the month.

The receiver further avers that the wages received by trainmen are also considerably reduced by reason of the fact that a needlessly large number, claiming to be a committee, have for many weeks been living in idleness, or engaged in stirring up discontent among their fellow employes, misrepresenting the actual condition of affairs, and attempting to manage and control the business which this honorable court has seen fit to intrust to the management of its receiver.

The receiver further avers that "a committee of thirteen in number, although claiming to be in the employ of your receiver, remained in practical idleness for more than two months, pretending to be in the business of regulating the business, wages, and terms of employment of their fellow workmen. But your receiver informs the court that the negotiations to which the personal attention of the committee was devoted might easily have been completed within a few days, or at most within a week, and that such negotiations were in fact terminated by the appeal of said petitioners to the circuit court of the United States for the district of Indiana about two months since. Your receiver is informed that the members of said committee claimed to have been sustained by financial contributions of fellow employes, and that their wages and expenses are paid from such contributions; and your receiver is informed that the wages and expenses of said committee for the time aforesaid, when they were not engaged in the work of your receiver, but were practically idle, amounted approximately to upwards of $4,000. Your receiver is informed that substantially that amount has at different times been assessed upon and in part collected from the employes claiming to be represented by said committee."

In reference to that part of the petition suggesting a decrease in employes in certain departments of the road, the receiver says that he has in his employ "three road masters, each having charge of a division of about one hundred and fifty miles, and each of whom is paid $100 a month. He also has in his employ a general road master, who, in addition to having charge of the division road masters, also performs the duties of assistant engineer, and is

the only civil engineer on the road employed as such." The receiver denies that any reduction in his assistants, as the petitioners suggest in their petition, is possible or consistent with the safe operation of the road.

To this answer of the receiver, the petitioners, on or about the 15th of January, filed their reply, in which they deny:

First. Every material allegation contained in the answer which is inconsistent with, or contradictory to, the petition.

Second. And, further replying, they claim that "prior to the making of the schedule mentioned in the petition and answer, they were working for less than the standard wages of the standard roads of the country; that the wages given them in the schedule of June 23d may not have been intended by the receiver to be a reduction of the wages of the employes generally, but it did cut the wages of these petitioners to an aggregate of over $21,000 per annum on overtime alone, and of over $6,000 for idle time compelled by said schedule to be given in the yards; that is to say, that men were required to be on hand to move the train at a given time, but not allowed for time lost between the time of their arrival in the yard and the time of leaving,—and this alone cuts the wages of employes over $6,000.

"Third. They deny that the reduction is general, but is unjust, and discriminates especially against these petitioners.

"Fourth. They deny that they represent but 425 out of 1,300 men, but aver that there are 525 men affected by this proposed abrogation, and all are herein represented; and that these petitioners are the only persons named in the schedule, and in fact the only persons with whom a contract is in force, and which written contract they ask to be respected; and they deny that the reduction, if any, in the employes who do not belong to organized labor is greater than the reduction to petitioners.

"Fifth. They deny that the pay fixed by the proposed or by the existing schedule is greater than that furnished and the pay thereunder made by the roads in said answer named, but they aver that if the schedule was given them, and the payment made as by said roads made to their employes, it would show the following to be the status of affairs."

Then follows a comparison of the wages paid upon several roads, from which, according to the petitioners' statement, their pay is less than the pay of employes on the roads named.

"Sixth. They deny that such reduction is essential to the efficient and successful operation of the property in charge of the receiver, but aver that saving could be made greatly in excess of the amount sought to be taken from them by the proposed schedule, if, in the road and other departments, equal and equitable economy were practiced, as shown by the following statement of officers, and the cost thereof."

Then follows a statement showing where and how the saving could be effected without affecting the safety of the service to the public or reducing the capacity of the road.

Jos. C. Suit and Walter B. Richie, for petitioners.

Clarence Brown, for receiver.

RICKS, District Judge, (after stating the facts.) The receiver appointed by the court to operate and manage the defendant railroad, pending foreclosure proceedings, is an officer of the court, and in that capacity represents all parties interested in the property. The persons employed by him occupy such a relation to the court that, in a controversy between them and the receiver concerning any alleged wrongs and injuries committed by him, they may be heard by the court upon a proper application being made. When such application is made, it becomes the duty of the court to consider the same, and, if the allegations are of a character to make it proper to further consider them, the receiver should be required to file an answer thereto. The court will then be able

to determine from such pleadings whether the issue between the parties is of such a character as to make it proper to hear testimony and make a formal investigation, either by reference to a master or by hearing witnesses in open court. But the very object in having a receiver experienced in the management of railroads to represent the court and operate the road and preserve the property preparatory to a sale is to relieve the court from the responsibility of its maintenance and management.

The receiver is chosen on account of his experience and sound judgment to operate the road for the benefit of the creditors and all concerned. While he is the officer of the court, and subject to the orders and directions of the latter, yet his instructions are always general in their character. He is expected to look after the details of the business, and to apply to the court from time to time when special instructions seem necessary. The very nature of his relations to the court, and his duties to the creditors, entitle him to the largest degree of discretion possible in the discharge of his duties.

The court is constituted of several judges, and the railroad being operated extends through several judicial districts, so that it is difficult to secure uniformity in the administration of the property when an attempt is made to retain control of the details of the management in the court. It is therefore the settled practice, both as a matter of comity between the judges and as a matter of necessity to the proper and safe administration of the trust, to impose, as far as possible, the management of the property upon the receiver, and to remit the supervision of his management to the court in which he was appointed, and in which the primary jurisdiction attached.

In view of this well-defined policy, it must be apparent that in the operation of a railroad extending from Toledo to St. Louis the court must necessarily rely upon the receiver, and hold him responsible for details. His discretion in such management will not be interfered with, except where some abuse and wrong is manifest. In Taylor v. Sweet, 40 Mich. 736, Judge Cooley, speaking for the supreme court of Michigan, in reference to the employment of help in the management of business confided to a receiver in that case, said:

"The receiver, however, has ample power to employ them, and any other persons whose services he may need, and we think a court, which can know much less about the needs of the business than the receiver, ought not to interfere with his discretion unless some abuse is alleged and shown."

In Kerr on Receivers the following principle is given in paragraph 175:

"If he is empowered by the court to continue the management of the business over which he is appointed, he may employ such persons as may be necessary for the purpose, and the court will not interfere with his discretion as regards such employment, unless some abuse is shown."

These principles of law were declared in a case where a receiver was managing the business of a partnership. With how much greater force and pertinence do they apply to a receiver charged with looking after the intricate business of a great railroad 450

miles in length, requiring familiarity with detail and expert knowledge, which can only be acquired through long training and experience!

A controversy recently arose between the engineers, firemen, and trainmen on the East Tennessee, Virginia & Georgia Railroad and the receivers in charge of that extended system, running through several states, as to an order of the latter concerning the wages of employes. The receivers were appointed in the circuit court of the United States for the eastern district of Tennessee. During the controversy, and while the chiefs of the organization of engineers and firemen were in Knoxville, negotiating with Receiver Fink on the subject, the former made representations as to the nature of the contention between them to Circuit Judge Lurton, then in Knoxville. The latter declined to entertain jurisdiction of the controversy, and remitted the question to the receivers, saying their decision would be final, unless palpable wrong and injustice were done.

This is the only proper practice to pursue in these controversies. Courts are not constituted to manage and operate railroads. The judges, learned in the law though they may be, are not experienced in large business undertakings. They are not trained in those departments of railroad management which relate to the wages of employes, to the numbers necessary for the maintenance of the roadbed and for the safe operation of trains, to the tariffs for freight, and the purchases of supplies. Even if capable of mastering such details, their time will not permit. They are occupied in determining the legal rights of parties in litigated cases, and though in these days of large ventures and improvident railroad enterprises the courts are called upon, through receivers, to temporarily manage them pending litigation necessary to a foreclosure sale, yet, as before stated, they assume this burden because it cannot be evaded; but they manage them through receivers, selected for their experience and demonstrated ability, and they rely upon their experience and judgment to wisely and economically administer the trust.

In view of these well-settled principles, let us examine the application now before the court. Do the petitioners in this case show such an abuse of the power and discretion of the receiver as to call for the interference of the court? The facts set forth in the complaint have already been substantially stated. The most serious averment made is that the schedule of wages agreed upon in June, 1893, contained a provision that no abrogation of it should be made except upon 30 days' notice, and it is averred that no such notice was given. The receiver avers that such notice was given. The fact is established not only that such notice was given on September 26, 1893, to the committee representing the petitioners, but that negotiations concerning such reduction in wages, continuing over a month, were carried on between said committee and the superintendent of the road, acting for the receiver. Mutual concessions resulted, and a full hearing was had, and a decision made by the superintendent. From that decision an ap-

peal was taken to the receiver. He heard the committee, made some further concessions, and then promulgated the schedule framed after such full negotiations and hearing, and ordered that it should take effect from November 1, 1893. In view of all these facts, I cannot see how the petitioners can so solemnly declare and aver that the receiver acted in bad faith with them in changing the schedule of June, 1893, without the notice and hearing for which it provided.

Other facts recited by counsel for the petitioners demonstrate the very embarrassments and difficulties already suggested that would confront the court should an investigation be undertaken as to the facts in issue. The petitioners seem to realize the force of the receiver's statement that the proposed reduction in wages is absolutely necessary, because of the substantial decrease in the earnings, which are stated from the books to be $365,194.51 for the last six months of 1893, as compared with the same period of 1892, or at the rate of $2,000 per day. They undertake to break the force of this statement by controverting the fact, but they do not undertake to do this by challenging the correctness of the receiver's books, or charging any manipulation in the accounts to make a false showing of the earnings. They attempt to show that there has been no such decrease, based upon a table of gross and net earnings of 12 trains on specified days in the month of October, and a few in the months of September and November. With a candor that can only be inspired by confidence in their calculations, the petitioners seriously controvert the official statements from the books. Their calculations are, of course, incomplete, and involve but a small part of the expenses of the road, which extend far beyond the mere cost of motive power and the handling of freight.

If we pass to the other averments in the petition, we find further embarrassments that would attend a hearing and judicial finding on the issues presented. The petitioners deny that a reduction of the wages of those they represent is necessary, because they say a great saving in the expenses can easily be made by a reduction in the numbers of officers and clerks in several other departments. They proceed to propose a practical reorganization of the road, and suggest in detail certain officers and employes in the department of maintenance and repair of tracks, and in other branches of the business, whose services could be dispensed with. They aver that too many men are employed on certain divisions of the road in the repair of tracks, that too many men are employed in clerical work, and that unnecessary officers are employed at extravagant salaries. They specify those extravagant sums, and allege salaries allowed greater than are paid to any one in the employ of the receiver, or even to the receiver himself, as the court well knows. The earnings of engineers and firemen are stated at a much lower figure than those shown to be paid by the receiver's answer, but those errors are shown to be reached by a wrong basis of calculation.

Reference is made to these general charges, and to the more detailed character of the issues presented, for the purpose of show-

CONTINENTAL TRUST CO. *v.* TOLEDO, ST. L. & K. C. R. CO. 521

ing how useless and barren of results would be an investigation upon the questions of fact involved. This court must accept the official reports of the receiver and the statements of his books as final on any issue as to whether or not there has been a decrease in the earnings of the road. The verity of his accounts could hardly be said to be put in issue by a denial of a decrease of earnings founded on any calculations made on such a partial and imperfect basis as the earnings of a few trains, as set forth in the petition.

Then the court is asked to hear testimony and pass upon the question of whether a few section foremen or deputy division superintendents or a few clerks could be dispensed with, so that a reduction in the wages of others might be made unnecessary. The receiver avers that the petitioners are paid wages as high, and some higher, than is paid for the same kind of labor by competing lines in the same territory. This petitioners deny, and recite facts and figures which seem to sustain their claim, but which, as stated, are susceptible of explanation to sustain the receiver's averment.

All these issues, if entered into, involve the court in a consideration of the entire present organization of this railroad, and in an examination as to the entire force of employes,—whether they are too numerous, whether their wages are too high, whether some could be entirely dispensed with or their duties combined in a fewer number, whether the rates of freight are too high, whether the earnings could be increased and the expenses diminished.

The very statement of the questions necessarily involved and to be fully considered and determined by such an investigation, and the nature of the evidence to be taken and considered in support of the various issues presented, is in itself sufficient to suggest the answer that the court cannot entertain any such proposition. As before stated, the determination of all such matters must necessarily rest with the receiver, and only when it is manifest that he has abused that discretion will the court interfere. It will then interfere, not by assuming to reverse his administration and settle the details of such complaints, but by selecting a new receiver, to whom such matters can more satisfactorily be intrusted. But no such abuse is shown.

I have treated this petition with the greatest respect, and have given it full and fair consideration. It is presented by over 500 men, who believe they have a grievance which the court should hear. They have chosen to come into court and petition for redress for their alleged grievances, rather than strike, or embarrass the receiver by any interference with the management of the property. I have therefore undertaken to state their claim at length and with fairness, to show them how impossible it is for a court to enter into a detailed investigation such as their petition invites with any possibility of reaching an intelligent and just conclusion. Without impugning the sincerity or good faith of the petitioners, and without passing upon the facts set forth in their complaint, it is sufficient to say that the present financial condition of the property, and the unfortunate and deplorable general busi-

ness depression and distress which everywhere prevails, all combine to satisfy the court that the claims of the receiver that this reduction in wages was absolutely necessary and inevitable are so manifestly true and just that the court, upon the pleadings and facts, of which we must take judicial notice, must find that no case for interference with the receiver's order is made.

The court the more readily reaches this conclusion because from repeated interviews with the receiver, and examination of the reports of earnings and expenses filed from month to month, I am satisfied this reduction of wages is unavoidable. During the time this property has been in the custody of the court, I have studied closely the policy and management of the receiver. He has the confidence of the court in the highest degree. He was chosen because of his long experience and conceded ability. The statement that during the six years of his management of the property now in his control, first as president and later as receiver, no serious accident has occurred, is the best proof that his duties have been faithfully discharged, and the confidence of the court is worthily bestowed. If the petitioners had presented to the receiver during their negotiations with him, or if they had suggested in their present application to the court, a reasonable proposition upon which they were willing to accept a fair reduction, and had placed their proposition in such shape that it did not involve the embarrassments and difficulties heretofore suggested, the court would feel hopeful that satisfactory results might follow further negotiations. But, in the absence of any such practical plan, it would be useless to give it further consideration.

The court feels authorized for these reasons to continue its management of this property under the judgment and discretion of the receiver, and to decline to interfere unless an abuse of that trust is shown. To the proper management of the property it is essential that there should be discipline and co-operation among all employes, and that the authority vested in the receiver should be maintained. This will be the policy of the court, and only when an abuse of that authority is clearly shown will it interfere. The matter of wages is one that naturally appeals to the sympathy of all. It would be far easier, and much more agreeable, to accede to this demand than to refuse it. If it were a mere matter of personal preference, or an appeal to the generous impulses of the court or the receiver, there would be no reduction of wages; but this property is a trust, to be administered for the benefit of creditors, and must be maintained and preserved to the best possible advantage for the interests of those whose money is unfortunately involved in the insolvent company, as well as for the just and fair compensation of those whose labor operates and preserves it.

For the reasons stated, the motion of the petitioners for an order to the receiver to set aside the schedule now in force, and to grant an investigation as to the necessity thereof, is refused.