THOMAS v. CINCINNATI, N. O. & T. P. RY. CO.

(Circuit Court, S. D. Ohio, W. D. May 31, 1894.)

No. 4,598.

1. RECEIVERS—REDUCTION OF WAGES—REASONABLENESS.

A railroad company, whose sole property was the equipment and leasehold of another road, passed into the hands of a receiver. The annual rent was a first lien on the equipment, and the leasehold was subject to forfeiture for nonpayment of the rent. Owing to general business depression, the earnings of the road fell off, until they were not sufficient to pay the rent, and the receiver ordered a reduction of 10 per cent. in the wages of all employes. It appeared that a like reduction had been theretofore made by competing roads, and that, in order to avoid discharging many employes, the receiver had been compelled to lessen the working time of each one. *Held*, that the reduction was not unreasonable.

2. SAME—WORKING TIME.

Where a 10 per cent. reduction of wages by a receiver of a railroad company is reasonable in itself under all the circumstances and the general condition of trade, it is not rendered unreasonable by the fact that his employes were already working on short time, with a proportionate reduction of wages; the shortening of time having been directed with their own consent, in order to avoid the discharge of many of their number.

Petition of Arland E. Brown and others in the suit of Samuel Thomas against the Cincinnati, New Orleans & Texas Pacific Railway Company.

Peck & Shaffer, for petitioners.

Harrison, Colston, Goldsmith & Hoadly, for receiver.

Before TAFT and LURTON, Circuit Judges.

TAFT, Circuit Judge. This is a petition by Arland E. Brown and others, claiming to represent a large majority of the men in the employ of Samuel Felton, heretofore appointed receiver herein, praying that the court direct him to modify an order issued by him on March 27th, and which went into effect May 1st, of this year. The order was as follows:

"Cincinnati, New Orleans and Texas Pacific Railway Company, S. M. Felton, Receiver.

"Cincinnati, March 27, 1894.

"The receiver regrets to announce to the officers and employes that, in spite of all the efforts made by the exercise of economies in every direction, a

reduction in wages cannot longer be prevented, owing to the enormous and continued decrease in earnings. It was hoped last fall that business throughout the country would show an early improvement, and that condition, together with the large economies inaugurated, would prevent the necessity for any general reduction in wages. This condition has not been realized. For the calendar year 1893, the gross earnings are over half a million dollars less than for the year 1890, and have shown a continued and steady decrease ever since that time. The last six months show the lowest earnings of any similar period since 1888. Therefore a general reduction of ten per cent. is ordered, effective on and after May 1st, to apply to all salaries over $35 a month and all wages over $1.10 per day, not including reductions of ten per cent. or more made since July 1st last.

                              "S. M. Felton, Receiver."

On the 30th of April, a petition was offered for filing in this court, which prayed that the foregoing order might be suspended and revoked. It was denied, because the petitioners, having had 30 days' notice, delayed presenting the petition until the day before the order went into effect. The court then stated that it would, however, hear an application to modify the order, and restore the rate of wages, on the service of five days' notice upon the receiver. The practice by which employes of railroad receivers are permitted to apply to the court for relief from any substantial grievance suffered by them in the operation of the road under the authority of the court is well established. It was approved by Mr. Justice Brewer in Frank v. Railway Co., 23 Fed. 757; by Judge Treat in Re Doolittle, Id. 544, 548; by Judge Speer in Waterhouse v. Comer, 55 Fed. 149; by Judge Ricks in Continental Trust Co. v. Toledo, St. L. & K. C. R. Co., 59 Fed. 514; by Judge Jenkins in Farmers' Loan & Trust Co. v. Northern Pac. R. Co., 60 Fed. 803–818; and by Judge Caldwell in the matter of the Union Pacific Railroad receivership, 62 Fed. 7. In accordance with this practice, and agreeably to the leave of court, the petitioners, after due notice to the receiver, have presented their petition praying that the order of March 27th be modified, and the old rate of wages restored, on the ground that the order is unfair and unreasonable, and works great hardship to the men. The receiver has filed an answer to the petition, and affidavits have been submitted by both sides on the issues of fact raised in the petition and answer. Judge LURTON kindly consented to sit with me to hear the case. The questions arising have been fully argued by counsel, and we are now to decide them. We have examined with minuteness all the evidence adduced, and have given it the consideration which a step so important in the policy of the receivership and so full of interest to many persons deserves.

The employes who are represented in the petition may be divided, for the purposes of this discussion, into three classes: First, the shopmen and machinists; second, the terminal yard men, including the engineers and firemen of switch engines, foremen of switch crews, and helpers; and, third, the trainmen, including engineers, firemen, conductors, and brakemen, all of them engaged in the operation of trains upon the road, as distinguished from the second class, whose duties are performed in shifting trains at terminal points.

1. The shopmen and machinists are employed in the repair shops of the company at Ludlow, Ky. They are paid a fixed sum per day

of 10 hours, the sum being reduced proportionately when the number of hours of work per day is reduced, so that really they are paid by the hour. There is no definite evidence on behalf of petitioners that the rate per hour paid by the receiver since the order of reduction went into effect is less than that which is paid by railway companies having shops in this vicinity. On the contrary, it seems from the affidavits filed by counsel for the receiver that the present rates per hour are quite equal to any paid in this market. It does appear beyond question, however, that the amount of time which each individual in the shop is required and permitted to work is at least 20 per cent. less than the time which he worked a year ago, so that his income is proportionately reduced. There has not been enough work to occupy all the men full time. Two courses have been open to the receiver,—he might discharge more men, and employ those remaining at full time; or he could do what he has done, divide the work to be done among all the men, and reduce the number of hours of work and income for each individual. By the latter course he was able to help more men to earn something. This course he understood to be the choice of all the men, and he took it. We fully approve his action. The receiver cannot make work for the men, nor can he pay any more per hour because many individuals work few hours than he would if fewer individuals worked full time. The reasonableness of the rate paid for the work is to be determined by the same standards, whether the work is done by many, working a few hours a day, or by that number who, working full time, would be sufficient to do it. Judging in this way of the rate of wages now paid shopmen and machinists, it is 10 per cent. less than it was when times were good and the demand for labor was constant.

2. The switch engineers, firemen, foremen of the switch crews, and helpers are paid by the day. Some railroad companies whose lines run into Cincinnati pay more per day to this class of employes than the receiver now pays under the order of March 27, while others pay about the same or·less. Whether the conditions of employment vary with these different companies we cannot judge. The hours seem to be about the same. We may reasonably presume that the rates of wages paid by the Cincinnati, New Orleans & Texas Pacific Railway Company in good times were the equivalent of market rates, because,·if they were not, then the employes would have sought employment elsewhere. An attempt has been made to show that the switch crews, for the year last past, have done more work than in previous years, because 9 engines and crews now do the work which 12 did before. But it appears that the difference is offset by a change in the arrangement of tracks in the switching yards, and by a reduction in the loads handled. The switch engines are called into use to assist trains up the grade from Ludlow to Erlanger,—a distance of six miles. This is a saving to the company, because it dispenses with the necessity of the "pusher" engine, required when business on the road was heavy. It is said that the switch engineer and fireman should receive road mileage for this service, because, under the agreement in force between the

receiver and his employes until March last, it was provided that switch engineers and firemen, when engaged in road service, should receive road mileage. We do not think such pushing from Ludlow to Erlanger is to be regarded as "road service" within the mean-ing of the exception. The pusher engine crew were paid by the day, and not by mileage. While the switch engine is pushing a train up to Erlanger, it is not engaged in yard service, and we do not see how the change adds to the day's labor of the crew. It is merely an economy effected by the receiver, and rendered possible by the present condition of light traffic. On the whole, the only effect of the order of March 27th upon the wages of the men engaged in the yard service is to reduce their compensation by 10 per cent. from that which they received when business was good. Complaint is made that their hours are longer than men engaged in similar service upon other roads, but the evidence does not sustain the claim. One crew, called the "lot crew," is detained more than others; but this detention is made up to them by an allowance of half a day every two weeks, when they do no work, but receive full pay.

3. We come now to the trainmen. No evidence has been pro-duced to us to show that the engineers, firemen, conductors, or brake-men on passenger trains operated by the receiver are paid any less wages under the order of March 27th than the same class of em-ployes on roads similarly situated. The whole controversy has been in respect of the crews operating the freight trains. It is exceed-ingly difficult for us intelligently to compare the rates of wages for freight engineers, firemen, conductors, and brakemen prevailing on the different lines running out of Cincinnati to the south of the Ohio river. These employes are paid by the run or trip, and the pay per trip seems to be graduated by the mileage of the trip. Affidavits for the men show that in many instances the rate per trip of the same number of miles on other roads for engineers and other trainmen is higher than that now paid by the receiver, while the receiver shows many other runs on competing roads in which the pay is the same or less than that which he allows. The differ-ences appear in runs of the same distance on different parts of the same road. It is obvious that conditions, not apparent, must vary the rates fixed for different runs, and that we cannot, with the lights we have, investigate them so as to make a useful or intelli-gent comparison for the purposes of this discussion. We must presume that the petitioners here received fair market rates for services they rendered before the financial depression began, about a year ago. It appears that the rates of wages of all these em-ployes were increased between 1890 and 1893 by from 8 to 12 per cent., showing that they were subject to the influence of the labor market. It is objected to the 10 per cent. reduction that, even before the order went into effect, the trainmen on freight trains received less income by 25 per cent. than they did this time last year, because they were permitted to make less runs. This is un-doubtedly true, but it is only because the receiver has, at the re-quest of all the men, kept more men in his employ than are needed

to do all the work when working a full number of trips. The reduction in income to each individual comes, not from a reduction in the rate paid for the work done, but from a commendable and unselfish willingness of all the men to make a sacrifice in the interest of those who would otherwise be discharged. As we have already said in reference to the shopmen and machinists, the reasonableness of the rate paid by the receiver cannot be affected by the fact that, out of consideration for the men, and at their request, he employs many men working fewer trips, instead of fewer men working more trips. Neither the receiver nor the court, whose officer he is, in the operation and preservation of the trust property, is justified in making work for employes, or in employing more men than are necessary to do the work to be done, if the employment of more men involves a greater expenditure for the same work.

Complaint is made that a change took place in 1893 in the manner by which "overtime" is calculated, and which was a virtual reduction in wages. Overtime is the time which men are delayed on their runs beyond that fixed by the schedule. Previous to the receivership, if a trainman worked 35 minutes over time, he was entitled to compensation at so much per hour. The receiver found that this led to such delays in trains that he changed the rule, and did not allow overtime until the schedule was exceeded by two hours, when it was calculated from the end of the schedule. Overtime was intended merely to compensate for unexpected delays, over which trainmen had no control, and was no part of a man's regular compensation. The change was in the discipline of the road, and seemed necessary to avoid abuses which had crept in. We do not think the change unreasonable.

But it is claimed that the freight-train men do more work per trip, in that the number of cars in each train is now greater. No showing is made that on any road the rate of pay per run or trip is made to vary by reason of the number of cars in the train. It is true that, during the last year, business has so fallen off that the number of freight trains has been reduced, and the number of cars in each train has been increased from an average of 21.6 cars per train for the eight months preceding March, 1893, to an average of 24.2 cars for the eight months preceding March, 1894. But we are not informed that an increase of 2.6 cars per train makes any difference in the rate paid trainmen on any road, or that, in view of the air brake which is now in use on 25 per cent. of all freight cars, it ought to do so.

It is further objected that men engaged in the freight service work more hours per trip than formerly. The schedules show that the average run previous to May, 1893, was eight hours, and that now the average run is twenty-four minutes longer. In making up this average, all freight trains run upon the road are included,— local freight, fast freight, and through freight. The schedule runs of the through freight trains have been increased considerably more than this average,—by nearly two hours,—so that some of them exceed ten hours. Rates of pay per trip seem to be governed by the mileage and the character of the train service, rather than by

the time employed (provided it does not exceed twelve hours); that is, by the amount of work to be done, rather than by the time it takes to do it. All schedules on this and other roads for through freights brought to our attention show a variation in the speed of different trains on the same trip of from one to two hours, and yet the rate paid per trip for such services is the same. The schedules must vary in length with the exigencies of travel, and it would seem peculiarly a matter of expert railroad knowledge as to how such schedules should be arranged. In the absence of any knowledge of our own, we must rely on the person to whose professional skill and discretion we have intrusted the operation of the road, and conclude that the lengthening of the schedules was necessary, and does not produce an unjust discrimination in the matter of work and rates of pay against the through-freight trainmen, as compared with other employes.

It follows from what has been said that under the order of March 27th, here complained of, the rate of wages paid by the receiver is a reduction of not more than 10 per cent. below what it was before the financial depression, when business was good. In the way already explained, many employes have their incomes reduced much more than this, because more men are retained in the service than are needed, and they do not all work full time; but, for the work which is being done, the receiver is paying but 10 per cent. less than when times were good. Is such a reduction unreasonable? Certainly not, if we have regard either to the receipts and earnings of the railroad, or to the course of many other roads in making similar reductions. The great competitor of the Cincinnati Southern Railroad is the Louisville & Nashville road, and wages upon that road were reduced in September last,—more than six months before the order here complained of went into effect. The receivers of the East Tennessee, Virginia & Georgia Railroad—one of the most extensive systems in the south—also made a 10 per cent. reduction in wages in the fall of 1893. The Big Four system likewise made a reduction of 10 per cent. about the same time. Other companies have been compelled to resort to the same economy.

The condition of the trust and the receipts of the receiver not only justify, but require, the reduction. The assets of the Cincinnati, New Orleans & Texas Pacific Railway consist solely of the equipment and leasehold of the Cincinnati Southern Railway. If the annual rental of $1,000,000 is not paid to the city of Cincinnati, the leasehold will be forfeited, and the property of the lessee company will be wholly sacrificed, because the city has a first lien for its rent upon the entire equipment. More than this, the city is almost entirely dependent on the rental to pay the interest which it owes on the bonds issued by it to construct the road, and a default in the rental will cause grave pecuniary danger to the city of Cincinnati, and may seriously impair its credit. To pay the rental, the road must earn over and above its operating expenses $83,333.33 per month. In addition to the rental, the lessee is obliged, under the lease, to expend a certain amount in perma-

nent improvements of the road.    Up to this time the receiver has paid the rental.    In order to do this, and to keep up the betterments required by the lease between April 1, 1893, and April, 1894, the receiver has been compelled to increase the floating debt of the road from $50,000 to $200,000.    During the 14 months of the receivership, there has been a decrease in gross earnings of $525,-000, and in operating expenses of $515,000, as compared with the previous 14 months.    This shows only a decrease in net earnings of $9,000, all told.    But, when we examine the decrease in the months of April and May of this year, the result is startling.    In April of 1893 the net earnings of the road were $74,143.02, while in April of this year they are but $40,700.    Considering that $83,-333.33 is needed each month to pay the rental, the significance of this falling off cannot be misunderstood.    In May of 1893 the net earnings were $71,206.56, while the net earnings for May of this year (with the last week estimated) are $31,600,—a falling off of nearly 70 per cent. from the same month last year.    It is hardly 40 per cent. of the amount required for rental.    It should be noted, too, that the earnings for May were made after the order here complained of went into effect.    Can it be said that it is possible for the receiver, under these circumstances, to increase expenses by restoring wages to the previous rate?

But it is argued by the learned counsel for the petitioners that the reduced earnings of the employer should have no bearing upon the proper rate of wages to be paid for labor; that the rate of wages is fixed by supply and demand.    That, in the long run, the price of labor is determined by the law of supply and demand, need not be denied, but the operation of this law is set on foot by the ·act of the employer, whose earnings are reduced by loss of business, in discharging unnecessary labor, and offering less rates for the labor he can use.    Moreover, the court must take judicial notice of the fact that there has been an enormous reduction in the demand for labor, with a corresponding increase in the supply.    Could we have any stronger evidence of it than in the fact that men in the employ of the receiver wish to divide up the work to be done, so that no one of them works full time?    It is not a pleasant duty for either a court or its receiver to cause any hardship to a·large number of men and their families, and the court is personally cognizant of the earnest, zealous, and painstaking efforts made by the receiver to avoid the necessity for this reduction.    At a time more than six months ago, when other roads were making a reduction, he declined to do so, and only now, when no other course is open to him, has he resorted to it.    Every other economy possible has been practiced, with the hope that business would improve, until now, with a default in the rental and a forfeiture of the leasehold staring him in the face, he has been forced to it.

In closing, we should call attention to the attitude which a court must assume in the discussion of such a question as this.    The court cannot and does not undertake to operate a railroad itself. It appoints, as its agent to do so, a man of well-known professional

skill and experience as a railroad manager. In his judgment, the court must necessarily repose a confidence, commensurate with the large interests intrusted to his care. Hearings of this kind may be had, and, if the receiver has made a manifest error or committed an abuse of the discretion intrusted to him, the court will correct it. But the burden of showing either must, in the nature of things, be upon the petitioner. We have gone more in detail into the complaints at the bar than was necessary in this view, but we have done it because the investigation was invited by both the men and the receiver. Mr. Felton, the present receiver, has no other interest than to serve the court faithfully and fairly in the administration of this property. He has no interest whatever in the Cincinnati, New Orleans & Texas Pacific Railway Company. His connection with it has been wholly professional. For that reason he was not deemed disqualified to act as receiver, though he had been the company's president. We desire to testify to the fidelity, energy, and singleness of purpose with which he has discharged his duties, and the sense of fairness he has always manifested in respect to his employes. If the time shall come when the interests of his trust and returning prosperity permit, we doubt not he will be glad to restore wages and work to all whom this order injuriously affects.

Our conclusion is that the order of the receiver here complained of was, under the circumstances, not unreasonable, but was necessary. The petition to modify the order, is denied.