MORLEY *v.* SAGINAW CIRCUIT JUDGE.

1. RECEIVERS—DISCRETION—SUPERVISION OF COURT.
   A receiver engaged in the active management of a great enterprise, like a street railway, must be clothed with considerable discretion, and his judgment in matters of detail should not be disturbed by the court unless an abuse of such discretion is shown.

2. SAME—STREET-RAILWAY REGULATIONS—COLLECTION OF FARES.
   The adoption by a receiver of a street-railway company of a system for collecting car fares, whereby the fare is placed by the passenger in a metal safe carried by the conductor, who registers the same by pressing a button, is a proper regulation with respect to a detail in the management of the road, and the court is not justified in directing its discontinuance on the ground that it is an imputation upon the honesty of the conductor.

3. SAME—EMPLOYÉS—RIGHT TO INTERVENE.
   A conductor of a street-railway company in the hands of a receiver does not stand in such relation to the receivership proceedings that he may intervene, and have an order of the receiver, requiring him to use a specified device in the collection of fares, reviewed by the court.

*Mandamus* by George B. Morley and Homer Loring, receivers of the Union Street-Railway Company of Saginaw, to compel Byron A. Snow, circuit judge of Saginaw county, to vacate an order requiring relators to discontinue the use of the Mehling system for the collection of car fares. Submitted May 17, 1898. Writ granted May 24, 1898.

*Humphrey & Grant* (*Benton Hanchett,* of counsel), for relators.

*E. L. Beach,* for respondent.

MOORE, J.   This is a petition for a *mandamus* to require the respondent to vacate an order made by him. The petitioners were appointed by the circuit court for the county of Saginaw, in chancery, receivers of the Union Street-Railway Company of Saginaw, Mich., upon the application of the Boston Safe-Deposit & Trust Company, complainant in a cross-bill in *Union Street-Ry. Co.* v. *City of Saginaw,* 115 Mich. 300.   The receivers were directed to take control of the road, and operate the same. At this time there was in the employ of the road, as a street-car conductor, John C. Smith, and he continued to act in that capacity after the appointment of the receivers. About April 1st the receivers adopted the Mehling box system of collecting car fares from passengers.   This box is a metal safe, of convenient size, carried by the conductor, into which the passenger is required to deposit his fare, at which time the conductor presses a button which rings a bell and registers the fare.   At the end of the day the box, with the transfer tickets, is handed by the conductor into the office, and becomes his settlement with the company.   The use of this box was distasteful to the conductor John C. Smith, who filed a petition in which he represented his long employment upon the road; the fact that he was required to carry one of these boxes; that he had no means of knowing that they were accurate; that their use made him responsible to the company for plugged or counterfeit coins; that passengers objected to their use, and when the conductors, following the rules adopted by the company, required the passengers to deposit their fares in the boxes or leave the car, it gave rise to controversies which resulted in injury to the conductors; and that he had been injured by a passenger who objected to paying his fare. He also represented that when attempting to use the boxes

of the company in good faith, according to the rules, he had been laid off from work for a number of days; and he asked for an order that the receivers might be required to pay him for the time so lost, and that the use of the boxes be discontinued. The receivers answered the petition, and claimed that the use of the boxes was a reasonable and proper regulation, and that Mr. Smith persistently and purposely refused to properly use them, and did so after being warned that, if he did not properly use the boxes as directed, he would be laid off. Proof was offered before the court from which it pretty clearly appears that there would be no difficulty in operating the boxes if the conductors were so inclined, and that there was no practical difficulty in the way of their use, either on the part of the passengers or the conductors. The court made an order granting the prayer of the petition, not for the reasons set up therein, but, to state it in his own language, used at the time he granted the order:

"It seems to me, in this matter, that the fact of the receivers publishing notices in the car that no conductor shall handle money, connecting that with the fact that he shall be liable and responsible for any plugged money or counterfeit money that is placed in these boxes, compelling the public to place the fares in these boxes, and for the further reason that it is objectionable to the public to be compelled to put the money in the boxes— For these reasons it seems to me that, coupling the advertisement with the request to the public, it means that the conductors are not to be trusted; that they are not to handle the money; that there is some honest person somewhere who can handle the money, and count it correctly, but that these men are liable not to do so. It is an insinuation of dishonesty. In my opinion, it is saying to the public, 'We have men in our employ whom we cannot trust, whom we are unable to trust, and I warn you that here is a man who is liable to appropriate to his own use money that he may collect that belongs to this railroad.' It tends to ostracise from society people who are so engaged,—so employed. Children talk of it on the street. People discuss it,—that they are not proper persons to associate with; they cannot be trusted in handling five-cent pieces.

I think this box is not a proper regulation; that it is not a thing to be used in the manner in which it is used; and an order may be made discontinuing the use of it."

We think the conclusion reached by the learned judge is wholly unwarranted by the facts.   Conductors of street cars deal with a great number of persons, some of whom are entering and leaving the cars frequently.   It often happens that change must be made, and there are opportunities for mistakes.   It is not unreasonable to assume that, like persons in all callings, some of the employés of street-car companies will yield to temptation, when presented.   Every one at all familiar with business upon a large scale knows that it is desirable to have it so systematized that mistakes or fraud in its conduct shall not occur.   Officials, both of the State and Nation, and officers charged with the management of banks, railroads, and other corporations, are surrounded by checks and safeguards calculated to do away with the possibilities of frauds or mistakes.   The cash register is to be found in most places of business.   Upon the elevated roads in the large cities, the passenger pays his fare before he enters upon the platform, over which he must pass to get admission to his train.   Every one recognizes these checks and safeguards as proper to be used, and no one has a right to regard them as an imputation upon the honesty of any individual using them.   Their use is simply a recognition of what we all know to be a fact, with humanity constituted as it is,—that, in the conduct of a large business by many persons, there is a liability to make mistakes, and a possibility of the commission of frauds.   The Great Teacher, in that prayer which is the model of all prayers, prayed, "Lead us not into temptation, but deliver us from evil."   It can readily be seen how the unintelligent or dishonest might object to these checks and safeguards, but it is difficult to understand how the honest and intelligent should object to any practical method which would reduce the probability of mistakes, or the opportunities for the commission of fraud, to the minimum.

It is urged on the part of the respondent that, as the receiver is an officer of the court, the control of the court over him is plenary, that whatever he does is done under the direction of the court, and that he is bound to observe the order of the court; citing 5 Thomp. Corp. § 6941. It is true that receivers are officers of the court. It is also true that less discretion is given to passive receivers, whose duty consists simply of taking possession of property, and converting it into money, and distributing it, than is allowed to an active receiver, who is required to manage a going concern like a system of street railways or a railroad. Such an officer, to be successful, must possess large executive ability, and must be clothed with considerable discretion. High, Rec. § 392. He may do such things, in the ordinary course of business, as to him, in good faith, seem necessary to render the business of the road profitable and successful. He is not only the arm of the court, but he represents, in a sense, the creditors and the stockholders of the road. If they had the time to do so, very few courts possess the necessary knowledge to enable them to successfully manage a system of street railways. It is said in *Continental Trust Co.* v. *Toledo, etc., R. Co.*, 59 Fed. 514:

"The receiver is chosen, on account of his experience and sound judgment, to operate the road for the benefit of the creditors and all concerned. While he is the officer of the court, and subject to the orders and directions of the latter, yet his instructions are always general in their character. He is expected to look after the details of the business, and to apply to the court, from time to time, when special instructions seem necessary. The very nature of his relations to the court, and his duties to the creditors, entitle him to the largest degree of discretion possible in the discharge of his duties. The court is constituted of several judges, and the railroad being operated extends through several judicial districts, so that it is difficult to secure uniformity in the administration of the property when an attempt is made to retain control of the details of the management in the court. It is therefore the settled practice, both as a matter of comity between the judges and as a matter of necessity to the proper and safe administration

of the trust, to impose, as far as possible, the management of the property upon the receiver, and to remit the supervision of his management to the court in which he was appointed, and in which the primary jurisdiction attached. In view of this well-defined policy, it must be apparent that in the operation of a railroad extending from Toledo to St. Louis the court must necessarily rely upon the receiver, and hold him responsible for details. His discretion in such management will not be interfered with, except where some abuse and wrong is manifest.

"In *Taylor* v. *Sweet*, 40 Mich. 736, Judge COOLEY, speaking for the Supreme Court of Michigan, in reference to the employment of help in the management of business confided to a receiver in that case, said: 'The receiver, however, has ample power to employ them, or any other persons whose services he may need; and we think a court, which can know much less about the needs of the business than the receiver, ought not to interfere with his discretion unless some abuse is alleged and shown.'

"In Kerr on Receivers the following principle is given, in paragraph 175: 'If he is empowered by the court to continue the management of the business over which he is appointed, he may employ such persons as may be necessary for the purpose; and the court will not interfere with his discretion as regards such employment, unless some abuse is shown.'

"These principles of law were declared in a case where a receiver was managing the business of a partnership. With how much greater force and pertinence do they apply to a receiver charged with looking after the intricate business of a great railroad, 450 miles in length, requiring familiarity with detail and expert knowledge which can only be acquired through long training and experience! A controversy recently arose between the engineers, firemen, and trainmen on the East Tennessee, Virginia & Georgia Railroad, and the receivers in charge of that extended system, running through several States, as to an order of the latter concerning the wages of employés. The receivers were appointed in the circuit court of the United States for the Eastern district of Tennessee. During the controversy, and while the chiefs of the organization of engineers and firemen were in Knoxville, negotiating with Receiver Fink on the subject, the former made representations as to the nature of the contention between them to Circuit Judge Lurton, then in Knoxville. The latter declined to entertain jurisdiction of the controversy,

and remitted the question to the receivers; saying their decision would be final unless palpable wrong and injustice were done.

"This is the only proper practice to pursue in these controversies. Courts are not constituted to manage and operate railroads. The judges, learned in the law though they may be, are not experienced in large business undertakings. They are not trained in those departments of railroad management which relate to the wages of employés, to the numbers necessary for the maintenance of the roadbed and for the safe operation of trains, to the tariffs for freight, and the purchases of supplies. Even if capable of mastering such details, their time will not permit. They are occupied in determining the legal rights of parties in litigated cases, and though, in these days of large ventures and improvident railroad enterprises, the courts are called upon, through receivers, to temporarily manage them pending litigation necessary to a foreclosure sale, yet, as before stated, they assume this burden because it cannot be evaded; but they manage them through receivers selected for their experience and demonstrated ability, and they rely upon their experience and judgment to wisely and economically administer the trust."

See, also, 20 Am. & Eng. Enc. Law, 370; *Cowdrey* v. *Railroad Co.*, 1 Woods, 336; *Sloan* v. *Railway Co.*, 62 Iowa, 733.

Applying these principles to the case in hand, what is the situation, and what should be the result? The receivers are in the management of a great property. They adopted a device which, in their judgment, is calculated to help make the management of the road successful and profitable. Their judgment is challenged by one of their employés. He appeals to the court. The receivers are supposedly appointed because of their responsibility and ability. The act of the receivers is a detail in the management of the road. The act done is not shown to be an abuse of discretion on the part of the receivers. If the court is to substitute its judgment for the judgment of the receivers in a detail of management like this, where will its duty end? Shall the court enter into the consideration of the entire organization of the road, and determine

whether one man shall be discharged and another employed? Will it enter into the inquiry as to the quality of the coal used in the power-house, or the brand of oil used as a lubricator? Will it entertain a complaint of an employé that he should be furnished with a pointed shovel in his work, instead of the one he is now required to use? We think the learned judge entered upon an inquiry that properly belongs with the receivers, and not with the court. If they are not competent to deal with such a detail of the management of the road, they should be removed, and some one appointed who is competent.

The writ should issue as prayed.

The other Justices concurred in the opinion of Moore, J.

Hooker, J. I concur in the result reached by my Brother Moore in this case, for the reasons stated in his opinion, and for the further reason that the relation of the petitioner to this proceeding is not such as to give him a right to intervene for the purpose mentioned in his petition. He is an employé, merely; and if he was not satisfied to perform such labor as the receivers had to do, in such a manner as the receivers wanted it done, he was under no obligation to continue in their employ. The proceeding is one brought to enable the creditors of the street-railway company to realize from its assets, which may be supposed to be inadequate to pay its debts. If every man in the employ of the receivers who chances to differ with them about the method of conducting the business may ask the intervention of the court to compel such changes as he may think advisable, the delay and expense to the receivers would be likely to exhaust the patience of creditors, and the property would be absorbed, to their exclusion. This petitioner is not a party to the record, nor is he a party in interest in any sense which should permit him to intervene. The only ground upon which his intervention might be justified is the claim to compensation during the time he was laid off. As to that, we find nothing in the case which would justify the

court in ordering the receivers to pay him for time that he was not at work, especially as his own conduct was just cause for his discharge, if any cause was necessary.

GRANT, C. J., and LONG, J., concurred in the opinion of HOOKER, J.

GRANT, C. J. I fully concur in the opinions of my Brothers MOORE and. HOOKER. I desire to say, in addition, that I do not think Judge Snow had any authority to pass upon the question, for the reason that the identical question had before been passed upon by Judge Wilber, in the case of *Kitchen* v. *Saginaw Circuit Judge.* Mr. Kitchen was a passenger, refused to put his fare in the box, was removed from the car, and applied to Judge Wilber for leave to sue the receivers. Judge Wilber refused, and his order thereon was affirmed by this court.[1] By Act No. 75, Pub. Acts 1889, an additional circuit judge was provided for the Saginaw circuit. Section 8 of that act (3 How. Stat. § 6480$p$) provides:

"No order shall be stayed, nor shall any stay of proceedings or injunction be had or set aside or modified or dissolved, except by the judge trying the case or making the order or granting the injunction, except that, in case of the absence from the county, sickness, or other cause disabling such judge to act, the other circuit judge shall have power to stay, modify, set aside, or dissolve such order or injunction. Neither judge shall grant any application which shall have been denied by the other."

The sole question in that case, as in this, was the reasonableness of the regulation. I think that the order of Judge Wilber under this statute was conclusive upon Judge Snow, and that he should for this reason have denied the order.

LONG, J., concurred in the opinion of GRANT, C. J.

---

[1] April 19, 1898; no opinion.