## WATERHOUSE et al. v. COMER.

(Circuit Court, W. D. Georgia, S. D. April 8, 1893.)

1. RECEIVERS OF RAILROAD COMPANIES — DIFFICULTIES WITH EMPLOYES — ADJUSTMENT BY THE COURT.

Where the property of a railway or other corporation is being administered by a receiver under the superintending power of a court of equity, it is competent for the court to adjust difficulties between the receiver and his employes, which, in the absence of such adjustment, would tend to injure the property and to defeat the purpose of the receivership.

**2. SAME.**

It follows, then, that it is in the power of the court, in the interest of public order and for the protection of the property under its control, to direct a suitable arrangement with its employes or officers, to provide compensation and conditions of their employment, and to avoid, if possible, an interruption of their labor and duty, which will be disastrous to the trust and injurious to the public.

**3. COMMERCE—AGREEMENTS TO RESTRAIN — ACT JULY 2, 1890 — COMBINATIONS OF EMPLOYES.**

Rule 12 of an association of locomotive engineers, styled the "Brotherhood of Locomotive Engineers," which provides "that hereafter, when an issue has been sustained by the grand chief, and carried into effect by the Brotherhood of Locomotive Engineers, it shall be recognized as a violation of obligations if a member of the Brotherhood of Locomotive Engineers who may be employed on a railroad run in connection with or adjacent to said road, to handle the property belonging to said railroad or system in any way that may benefit said company with which the Brotherhood of Locomotive Engineers are at issue, until the grievances or issues or differences of any nature or kind have been amicably settled,"—is plainly a rule or agreement in restraint of trade or commerce, and violative of section 1 of the act of congress of July 2, 1890.

**4. SAME—CONSPIRACY—REV. ST. § 5440.**

Construing several clauses of the interstate commerce law recited in the opinion with section 5440 of the Revised Statutes, it follows that a combination of persons, without regard to their occupation, which will have the effect to defeat the provisions of the interstate commerce law, inhibiting discriminations in the transportation of freight and passengers, and further to restrain the trade or commerce of the country, will be obnoxious to the penalties therein prescribed.

**5. SAME—RECEIVERS—ADVICE OF COURT.**

In this case, the movants having avowed their purpose, in open court, to submit to the construction to be made by the court relating to rule 12 of the brotherhood, the receiver is directed to enter into an appropriate contract with them, subject to the general operation of this decision with reference to said rule.

(Syllabus by the Court.)

In Equity. Petition by Waterhouse and others, styling themselves the "Committee of Adjustment of the Brotherhood of Locomotive Engineers," against H. M. Comer, receiver of the Central Railroad & Banking Company of Georgia, asking that the receiver be directed to make a contract with the locomotive engineers. Granted.

R. W. Patterson, for the motion.

Lawton & Cunningham and Marion Erwin, opposed.

SPEER, District Judge. Cases are frequent where persons intrusted with corporate properties have applied to the courts for the prevention or redress of grievances threatened or inflicted by labor organizations. This is the first instance of which we have any information where members of such an association have by concerted action, in an orderly way, sought the arbitrament of a court to adjust a controversy relative to the wages and conditions of their employment. The recent application to this court of the Order of Railway Telegraphers, with similar purpose, was an attempt of this character. It was defeated in limine. The telegraphers, as a body, had abandoned the service of the receiver before they presented their petition. In the mean time, other telegraphers, with equal

right to employment by the receiver, had been engaged, and were performing the functions the striking telegraphers had surrendered, and, notwithstanding the solicitude of the court to spare a large number of intelligent young men the distress resulting from their indiscreet action, it was found to be impracticable. The members of the Brotherhood of Locomotive Engineers, who have presented this petition, have a proper standing in court. There are 250 locomotive engineers in the employment of the receiver, upon the various divisions of the Central Railroad & Banking Company of Georgia. Of these 211 are members of the Brotherhood of Locomotive Engineers, and the petitioners are a committee from that membership. They recite in their petition the facts that they have been for several years working under contracts made between a general committee of the brotherhood and the officers of the railroad. Since the 1st day of December, 1891, they have been working under the contract, of which they attach a copy, and since that time the properties have been intrusted to the control of Hugh M. Comer, as the receiver of the court. This contract expired on the 1st day of December, 1892. A few days prior to that time they gave notice to George D. Wadley, general superintendent of the company, that they desired certain changes in the contract. They state further that they have remained in the service of the company, although the superintendent and receiver refused to enter into any new contract or consider the old contract longer in force, unless ordered so to do by the court.

Pending the adjustment of the controversy, which was postponed for 90 days by virtue of a clause of the contract, which entitled the receiver to notice for that period, and of which he claimed the benefit, the court has continued the contract in force.

We have also caused several conferences between the receiver and the engineers, with the hope that an amicable agreement might follow. This expectation has been defeated by a strike on the Savannah, Americus & Montgomery Railroad, the refusal of one of the engineers to haul a train to which a car of that company was attached, his immediate discharge, and the friction between the receiver and the engineers which resulted therefrom. The engineers then applied to the court. They set forth the objects of their order, the advantages of a contract with their employers, and that such contracts are of force upon a very large proportion of the principal railroads of the country. They state that since it has been shown to them that the properties in the hands of the receiver are embarrassed financially, they are content to work in his service without any increase of wages, although they insist that the rate is less than that paid by competing and connecting lines, and they pray that the receiver be directed to continue in force the contract under which they were working at the time the receiver was appointed, subject to such modifications and changes as may be made by the order of the court. They annex a copy of this contract.

The receiver answers: First. That the Grand National Brotherhood of Locomotive Engineers is not incorporated, and that many of its rules and regulations, which have a bearing upon any con-

tract its members might make, are withheld from the public. This places him at a disadvantage, and renders uncertain the attitude of the brotherhood in any difficulty which might arise in connection with the contract. Second. That a number of the locomotive engineers employed by him are not members of the brotherhood, and that it is not proper for him to contract in this way with certain employes, while others are employed without such a contract. Third. That such a contract renders it impossible for the officers charged with the operation of the property to have such freedom in its administration as is necessary to its prompt and efficient management. Fourth. As a common carrier, the railroad under his control is liable for damages which may result from the disorganization of its service. That the Brotherhood of Locomotive Engineers is bound by secret obligations to withdraw from the service of railroad companies in a body, causing great damage. Fifth. That he should be at full liberty to select the best men and means of managing the business, without regard to organizations of any kind. That his superintendent has prepared a proper schedule of wages and conditions for the employment of engineers and firemen, a copy of which is attached. Sixth. If he should contract with the brotherhood, it would be holding out a premium for his employes to become members of that order, which respondent states is not to the interest of his trust. That the brotherhood renders it impossible for the officers of the railroad to come into direct contact with the employes, and prevents such free intercourse as is necessary to good and efficient service. That no contracts have been entered into with the Order of Railway Conductors and the Brotherhood of Locomotive Firemen, and that he has had no difficulty with the conductors and firemen. He denies that it is usual and customary for railroad companies of the United States to make such contracts with the Brotherhood of Locomotive Engineers.

It will be observed that much of the receiver's answer is an argument against the propriety and policy of contracts of any character between the officers of railway corporations and the representatives of labor organizations. The gravity and importance of the considerations thus presented are exceedingly great. The control, under any circumstances, by the courts, of contracts between representatives of the immense values invested with corporations engaged in the public duty of transportation, and the laborers employed in the same service, will doubtless appear to many as novel and dangerous. It is well, however, to consider if a proper provision, by appeal to the courts, in the frequent and destructive conflicts between organized capital and organized labor will not afford the simplest, most satisfactory and effective method for the settlement of such controversies. Is it not the only method by which the public, and, indeed, the parties themselves, can be protected from the inevitable hardship and loss which all must endure from the frequently recurring strikes?

It will not be wise for those engaged with the maintenance of public order to ignore the immensity of the changes in the relations of the employing and the employed classes, occasioned by the phe-

nomenal development of commerce and the prevalence of labor organizations. We are in this case directly concerned with a corporation and a labor organization, and both engaged in railway transportation; and in this department of industry it is reported by the interstate commerce commission that there is invested, in the United States $9,829,475,015, or nearly eight times the entire national debt of the country. Last year the railroads transported 530,000,000 passengers, or more than eight times the entire population of the United States. The operatives employed by them number 784,000, and it is no trifling testimony to the faithfulness and efficiency of this mighty army of railroad employes that of the vast population transported under their care only 293, or less than one twenty-thousandth of 1 per cent. lost their lives. It is, moreover, true that no operatives of a railroad more than locomotive engineers are charged with the preservation of life and property, and when we are advised by the proof that 32,000 of the locomotive engineers of the United States, more than 80 per cent., belong to the brotherhood, it is difficult to believe that their membership lessens efficiency to employers or fidelity to their supreme duty to the public. But whether these facts and other facts equally significant will justify judicial control of contracts essential to the uninterrupted transportation of the country, in which the public is so vitally concerned, it is clear that where the property of railway or other corporations is being administered by a receiver, under the superintending power of a court of equity, it is competent for a court to adjust difficulties between the receiver and his employes, which, in the absence of such adjustment, would tend to injure the property and to defeat the purpose of the receivership. Indeed, the power of the court to direct a contract between its officers does not appear to be questioned. The power of the court has always, on proper occasions, been exercised to protect the properties from the damaging and unlawful results of a strike of the laborers in its employ.

In the case of The Telegraphers v. Comer,[1] (decided at this term,) while this court, as above stated, was prevented by their own conduct from according to the petitioners the practical relief they sought, they were enjoined from any interference with the property, operations, or employes of the receiver, and rules were issued against individuals who were charged with such interference. In Re Higgins, 27 Fed. Rep. 444, the learned circuit judge of this circuit, the Honorable Don A. Pardee, declared:

"It is well-settled law that whoever willfully interferes with property in the possession of a court is guilty of a contempt of that court, and I regard it as equally well settled that whoever unlawfully interferes with officers and agents of the court, in the full and complete possession and management of the property in the custody of the court, is guilty of a contempt of court, and it is immaterial whether this unlawful interference comes in the way of actual violence or by intimidation and threats. The employes of the receiver, although pro hac vice officers of the court, may quit their employment, as can employes of private parties or corporations, provided they do not thereby intentionally disable the property; but they must quit peaceably and decently. Where they combine and conspire to quit, with or without notice, with the

_____
[1] Not reported, as the present case is controlling on the questions in issue.

object and intent of crippling the property or its operation, I have no doubt that they thereby commit a contempt; and all those who combine and conspire with employes to thus quit, or, as officials of labor organizations, issue printed orders to quit, or to strike, with an intent to embarrass the court in administering the property, render themselves liable for contempt of court."

Certainly, it follows, then, that it is in the power of the court, in the interest of public order, and for the protection of the property under its control, to direct a suitable arrangement with its employes or officers, to provide compensation and conditions of their employment, and to avoid, if possible, an interruption of their labor and duty, which will be disastrous to the trust and injurious to the public. There is no reason why the receivership, in this respect, should be conducted in a manner differing from the large preponderance of the successful and prosperous railroads of the country. It appears from the proof that about 90 per cent. of the railroads of the United States make contracts or schedules of rates and regulations for the employment of their operatives, which are agreed to by the representatives of both parties. We are satisfied from these facts that such arrangements, under proper restrictions, are praiseworthy and beneficial to both parties, and we therefore shall not longer hesitate to direct the receiver to enter into an appropriate contract or schedule of rates and regulations with the engineers. This contract, however, will not be restricted to members of the Brotherhood of Locomotive Engineers, although membership of that order is and will be no disqualification to service on railroads under the control of this court so long as the rules and regulations of the order are treated as subordinate to the law of the land. The contract will comprehend all engineers employed by the receiver, whether members or nonmembers of the brotherhood.

This brings us to the consideration—First, what is an appropriate contract; and, second, whether there is anything in the rules and regulations of the brotherhood and its relations to these properties which is inconsistent with the law, and which would make it improper for the court to place its receiver in a position where, in his exigent duty to carry on the business of transportation, for which the railroad was chartered by the state, he may find himself in the power of an organized body of his operatives who will be able to paralyze the operations of the properties. The appropriateness of the contract depends solely upon the arrangement of details. There is no difference between the engineers and the receiver upon the question of compensation. There is an apparent dispute about the effect of seniority of service of an engineer as affecting promotion. The court will provide, however, that, where merit and ability are equal, seniority of service shall prevail, and will arrange a fair tribunal for the purpose of testing the merit and ability of various candidates for promotion, with the privilege of either party in cases not reconcilable to appeal to the court. There are other instances of minor disagreement which the court will take time to adjust and to perfect the agreement.

We have noted with gratification the repeated statements made in judicio by the engineers and their counsel that they will accept

as final and satisfactory of every difference the conclusion and decision of the court. The receiver has also expressed more than once his purpose to abide the decision. This submission, so unlike the violent and irrational course pursued by either party, as their interests might prompt, and without the slightest regard to the rights of the public, in many conflicts between what are popularly called "capital and labor," is considerate, judicious, and strongly argues that the engineers who are before the court are good citizens, —indeed, patriots who respect and confide in the constituted authorities of their country. Fortunate will it be for our country if future differences of a similar character may be settled by a method so simple and so safe. This submission of the engineers applies as well to the remaining and most important difference between the parties, and that is the effect upon the duty to the court and to the property of the rule of the brotherhood, which is understood by the court to be as follows:

"(12) That hereafter when an issue has been sustained by the grand chief and carried into effect by the Brotherhood of Locomotive Engineers, it shall be recognized as a violation of the obligations if a member of the Brotherhood of Locomotive Engineers who may be employed on a railroad run in connection with or adjacent to said road to handle the property belonging to said railroad or system in any way that may benefit said company with which the Brotherhood of Locomotive Engineers are at issue, until the grievances or issues of difference of any nature or kind have been amicably settled."

This rule is understood to have been adopted by the brotherhood in Denver three years ago. In his testimony, Mr. A. B. Youngson, the assistant chief engineer, frankly admitted that the effect of this rule, as applied to the properties in the hands of the receiver and the engineers in his employ, would be as follows: If, in the pursuance of the business of a common carrier, with which the receiver is charged, it should become necessary to convey over the lines of the Central Railroad a car belonging to a railroad company on which there was a strike of the engineers, that it would be the duty of the brotherhood men in the employ of the receiver to refuse to haul the train containing such car, and, if the officers of the road insisted that the car should proceed, loyalty to the brotherhood required that the engineer should at once resign his station, and abandon his duty. He might, he stated, if he thought proper, carry the train to the terminal point.

An illustration of the effect of this rule is afforded by the evidence. A strike was recently pending on the Savannah, Americus & Montgomery Railroad, which runs in connection with and is adjacent to the Central. Engineer Arden of the Brotherhood of Locomotive Engineers, in the employ of the receiver, was directed to carry a car of the Savannah, Americus & Montgomery road between two stations on the Central Railroad. He declined to do so, and was at once discharged. A committee of the brotherhood have insisted on his reinstatement. This the receiver has refused, and it is certain that but for the pendency of the proceedings now under consideration by the court, there would be, as a result of Engineer Arden's construction of his duty, and the receiver's action, a strike of the

engineers upon every line of the Central, with all the calamitous results to the public, to the road, and to the engineers which would inevitably ensue. The receiver relies upon this as the main and controlling reason why he should not be required to enter into a contract with the brotherhood, when this rule 12 will necessarily be written into the contract. Now, there can be not a doubt that this rule of the brotherhood is in direct and positive violation of the laws of the land, and no court, state or federal, could hesitate for a moment so to declare it.

It is plainly a rule or agreement in restraint of trade or commerce. Section 1 of the act of July 2, 1890, known as the "Sherman Anti-Trust Law," provides:

"Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of. trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by a fine not exceeding $5,000, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

Section 7 of the act of February 4, 1887, entitled "An act to regulate commerce," provides—

"That it shall be unlawful for any common carrier, subject to the provisions of this act, to enter into any combination, contract, or agreement, expressed or implied, to prevent, by change of time schedule, carriage in different cars, or by other means or devices, the carriage of freights from being continuous from the place of shipment to the place of destination; and no break of bulk, stoppage, or interruption made by such common carrier shall prevent the carriage of freights from being, and being treated as, one continuous carriage from the place of shipment to the place of destination, unless such break, stoppage, or interruption was made in good faith for some necessary purpose, and without any intent to avoid or unnecessarily interrupt such continuous carriage, or to evade any of the provisions of this act."

Section 8 of the same provides—

"That in case any common carrier subject to the provisions of this act shall do, cause to be done, or permit to be done any act, matter, or thing in this act prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this act required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this act, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as a part of the costs in the case."

This is the interstate commerce law, and, as amended by the act of congress of March 2, 1889, provides:

"Sec. 3. (a) Undue Preference. That it shall be unlawful for any common carrier, subject to the provisions of this act, to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation or locality, or any particular description of traffic in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever. (b) Facilities for Interchange of Traffic. Every common carrier subject to the provisions of this act shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivering of passengers and property to and from their several lines and those connecting therewith,

and shall not discriminate in their rates and charges between such connecting lines; but this shall not be construed as requiring any such common carrier to give the use of its tracks or terminal facilities to another carrier engaged in like business."

"Sec. 10. Penalties for Violation of the Act. That any common carrier, subject to the provisions of the act, or, whenever such common carrier is a corporation, any director or officer thereof, or any receiver, trustee, lessee, agent, or person acting for or employed by such corporation, who alone or with any other corporation, company, person, or party, shall willfully do or cause to be done, or shall willingly suffer or permit to be done, any act, matter or, thing in this act prohibited or declared to be unlawful, or who shall aid or abet therein, or who shall willfully omit or fail to do any act, matter, or thing in this act required to be done, or shall cause or willfully suffer or. permit any act, matter, or thing so directed or required by this act to be done, not to be so done, or shall aid or abet any such omission or failure, or shall be guilty of any infraction of this act, or shall aid or abet therein, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof in any district court of the United States within the jurisdiction of which such offense was committed, be subject to a fine of not to exceed $5,000 for each offense: provided that, if the offense for which any person shall be convicted as aforesaid shall be an unlawful discrimination in rates, fares, or charges for the transportation of passengers or property, such person shall, in addition to the fine hereinbefore provided for, be liable to 'imprisonment in the penitentiary for a term of not exceeding two years, or both such fine and imprisonment, in the discretion of the court."

The laws of the United States (section 5440 of the Revised Statutes) provide:

"If two or more persons conspire either to commit any offense against the United States or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of conspiracy, all the parties to such conspiracy shall be liable to a penalty of not less than one thousand dollars, and not more than ten thousand dollars, and to imprisonment not more than two years."

Construing these several enactments together, it will be seen that a combination of persons, without regard to their occupation, which will have the effect to defeat the provisions of the interstate commerce law inhibiting discriminations in the transportation of freight and passengers, and further to restrain the trade and commerce of the country, will be obnoxious to severe penalties. This will apply with even greater force to persons in the employ of the railroads concerned.

Now, it is true that in any conceivable strike upon the transportation lines of this country, whether main lines or branch roads, there will be interference with and restraint of interstate or foreign commerce. This will be true also of strikes upon telegraph lines, for the exchange of telegraphic messages between people of different states in interstate commerce. In the presence of these statutes, which we have recited, and in view of the intimate interchange of commodities between people of several states of the Union, it will be practically impossible hereafter for a body of men to combine to hinder and delay the work of the transportation company without becoming amenable to the provisions of these statutes. And a combination or agreement of railroad officials or other representative of capital, with the same effect, will be equally under the ban of the penal statutes. It follows, therefore, that a strike, or "boycott," as it is popularly called, if it was ever effective, can be so

no longer. Organized labor, when injustice has been done or threatened to its membership, will find its useful and valuable mission in presenting to the courts of the country a strong and resolute protest and a petition for redress against unlawful trusts and combinations which would do unlawful wrong to it. Its membership need not doubt that their counsel will be heard, nor that speedy and exact justice will be administered wherever the courts have jurisdiction. It will follow, therefore, that in all such controversies it will be competent, as we have done in this case, for the courts to preserve the rights of the operatives, to spare them hardship, and at the same time to spare to the public the unmerited hardship which it has suffered from such conflicts in the past. It will be also found that by such methods organized labor will be spared much of the antagonism it now encounters, and in its appeal to the courts it will have the sympathy of thousands, where, in its strikes, it has their opposition and resentment.

But, if there were no statutory enactments upon the subject, no court of equity could justifiably direct its receiver to enter into a contract with a body of men who hold themselves bound to repudiate their contract, and disregard a grave public duty, because of real or alleged grievances, which some other person or corporation, not a party to the contract, inflicts or is alleged to inflict, not upon a party to the contract, but upon somebody else. To compel the receiver to do this would be monstrous. The receiver may be wholly just, considerate, humane, and even indulgent, to the engineers in his employ. They may, with reason, regard him not only as their kindly employer, but as their friend. The people of Georgia may have afforded to them every needed evidence of sympathy; the compensation may be ample; their future as bright as possible for intelligent, energetic, and courageous manhood; and yet, because of a difficulty with or without cause which originates in Maine or Minnesota, they will abandon the service of their kind employer, and forego the realization of their own hopeful anticipations, and bring dismay, and it may be ruin, upon the kindly and sympathetic people among whom they live. This is almost the inevitable consequence of this rule. It is in evidence, and is generally known, that almost the entire business of transportation of freight is carried on in cars which, without breaking the bulk of their freight, are forwarded from one railroad to another. This is an absolute necessity. The interests of the public and the economies of cheap and rapid transit demand it. There are 1,200,000 cars upon the railroads of the United States. There are 168,400 miles of railroad, or more than seven cars per mile.

The Central Railroad, according to the recent report of the superintendent, has less than two cars per mile. It is therefore indispensable that it should use the cars of other lines; but, if it were otherwise, it would be impossible, under the present system, to deny to the cars and freight of other lines transit over the lines of the Central without violation of the law. The receiver cannot violate the law, and the engineers cannot compel him to do so without themselves becoming obnoxious to the criminal statutes. And the court

does not doubt, from their bearing and testimony in the case, that they only need to be advised of these facts, when they will immediately recede from the unlawful and most dangerous attitude in which this rule has placed them. It is, indeed, a rule which, more than all others, has given strength and comfort to the enemies of organized labor.

It is true, however, that the learned counsel for the petitioners, when his attention had been called by the court to the insuperable difficulty in the way of a mutually beneficial contract presented by this rule, while insisting that it ought not to stand in the way of a contract, hastened to afford additional evidence of the good faith of his clients, by stating unreservedly that upon this, as upon all subjects, they were willing and anxious to take the direction of the court. This declaration is authoritative, and the court will act upon it. It is binding upon the engineers of the brotherhood, who are officers of the receiver, and who were represented by the committee and their assistant chief engineer, Mr. Youngson, all of whom were in the presence of the court when it was made. It is accepted as made in good faith, and as a condition of the contract which the court will direct the receiver to make. While, therefore, any engineer may, at any time, exercise his right as an individual to leave the services of the receiver, he may not do so in such manner as to injure the properties or impede its proper management.

In case of any issue with the management in which the brotherhood or its members are concerned, and the members in the employ of the receiver shall desire to leave his services, in a body or otherwise, in such manner as may in any way impede the operations of the road, they will be required to do so upon such terms and conditions as to the court may seem proper for the protection of the interest of the property and the maintenance of justice and fair play to all concerned. In the mean time the old contract will remain in force, always under the general operation of this decision with refernce to rule 12 of the brotherhood, until the terms of the new contract are definitely settled by the court; and it will be specially directed that no engineer or other person in the employ of the Central Railroad shall be discharged or in any way injured in his station on account of this proceeding, or any step taken in regard to its inception or advocacy.