ALLEN BRADLEY CO. ᴇᴛ ᴀʟ. *v.* LOCAL UNION NO. 3, INTERNATIONAL BROTHERHOOD OF ELEC-TRICAL WORKERS, ᴇᴛ ᴀʟ.

No. 702.   Argued March 8, 9, 1945.—Decided June 18, 1945.

*Mr. Walter Gordon Merritt* for petitioners.

*Mr. Harold Stern* for respondents.

Mr. Justice Black delivered the opinion of the Court.

The question presented is whether it is a violation of the Sherman Anti-trust Act[1] for labor unions and their members, prompted by a desire to get and hold jobs for themselves at good wages and under high working standards, to combine with employers and with manufacturers of goods to restrain competition in, and to monopolize the marketing of, such goods.

Upon the complaint of petitioners and after a lengthy hearing the District Court held that such a combination did violate the Sherman Act, entered a declaratory judgment to that effect, and entered an injunction restraining respondents from engaging in a wide range of specified activities. 41 F. Supp. 727, 51 F. Supp. 36. The Circuit Court of Appeals reversed the decision and dismissed the cause, holding that combinations of unions and business men which restrained trade and tended to monopoly were not in violation of the Act where the bona fide purpose of the unions was to raise wages, provide better working conditions, and bring about better conditions of employment for their members. 145 F. 2d 215. The Ninth Circuit Court of Appeals having reached a contrary conclusion in a similar case, 144 F. 2d 546, we granted certiorari in both cases.

The facts were sufficiently set out in the opinions below and need not be detailed again. The following summary will suffice for our purposes.

Petitioners are manufacturers of electrical equipment. Their places of manufacture are outside of New York City, and most of them are outside of New York State as well. They have brought this action because of their desire to sell their products in New York City, a market area that has been closed to them through the activities of respondents and others.

---

[1] 26 Stat. 209; 50 Stat. 693.

Respondents are a labor union, its officials and its members. The union, Local No. 3 of the International Brotherhood of Electrical Workers, has jurisdiction only over the metropolitan area of New York City. It is therefore impossible for the union to enter into a collective bargaining agreement with petitioners. Some of petitioners do have collective bargaining agreements with other unions, and in some cases even with other locals of the I. B. E. W.

Some of the members of respondent union work for manufacturers who produce electrical equipment similar to that made by petitioners; other members of respondent union are employed by contractors and work on the installation of electrical equipment, rather than in its production.

The union's consistent aim for many years has been to expand its membership, to obtain shorter hours and increased wages, and to enlarge employment opportunities for its members. To achieve this latter goal—that is, to make more work for its own members—the union realized that local manufacturers, employers of the local members, must have the widest possible outlets for their product. The union therefore waged aggressive campaigns to obtain closed-shop agreements with all local electrical equipment manufacturers and contractors. Using conventional labor union methods, such as strikes and boycotts, it gradually obtained more and more closed-shop agreements in the New York City area. Under these agreements, contractors were obligated to purchase equipment from none but local manufacturers who also had closed-shop agreements with Local No. 3; manufacturers obligated themselves to confine their New York City sales to contractors employing the Local's members. In the course of time, this type of individual employer-employee agreement expanded into industry-wide understandings, looking not merely to terms and conditions of employ-

ment but also to price and market control. Agencies were set up composed of representatives of all three groups to boycott recalcitrant local contractors and manufacturers and to bar from the area equipment manufactured outside its boundaries. The combination among the three groups, union, contractors, and manufacturers, became highly successful from the standpoint of all of them. The business of New York City manufacturers had a phenomenal growth, thereby multiplying the jobs available for the Local's members. Wages went up, hours were shortened, and the New York electrical equipment prices soared, to the decided financial profit of local contractors and manufacturers. The success is illustrated by the fact that some New York manufacturers sold their goods in the protected city market at one price and sold identical goods outside of New York at a far lower price. All of this took place, as the Circuit Court of Appeals declared, "through the stifling of competition," and because the three groups, in combination as "co-partners," achieved "a complete monopoly which they used to boycott the equipment manufactured by the plaintiffs." Interstate sale of various types of electrical equipment has, by this powerful combination, been wholly suppressed.

Quite obviously, this combination of business men has violated both §§ 1 and 2 of the Sherman Act,[2] unless its conduct is immunized by the participation of the union. For it intended to and did restrain trade in and monopo-

[2] Sections 1 and 2 provide in part as follows:

"Sec. 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal . . .

"Sec. 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor . . ."

lize the supply of electrical equipment in the New York City area to the exclusion of equipment manufactured in and shipped from other states, and did also control its price and discriminate between its would-be customers. *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469, 512–513. Our problem in this case is therefore a very narrow one—do labor unions violate the Sherman Act when, in order to further their own interests as wage earners, they aid and abet business men to do the precise things which that Act prohibits?

The Sherman Act as originally passed contained no language expressly exempting any labor union activities. Sharp controversy soon arose as to whether the Act applied to unions. One viewpoint was that the only evil at which Congress had aimed was high consumer prices achieved through combinations looking to control of markets by powerful groups; that those who would have a great incentive for such combinations would be the business men who would be the direct beneficiaries of them; therefore, the argument proceeded, Congress drafted its law to apply only to business combinations, particularly the large trusts, and not to labor unions or any of their activities as such. Involved in this viewpoint were the following contentions: that the Sherman Act is a law to regulate trade, not labor, a law to prescribe the rules governing barter and sale, and not the personal relations of employers and employees; that good wages and working conditions helped and did not hinder trade, even though increased labor costs might be reflected in the cost of products; that labor was not a commodity; that laborers had an inherent right to accept or terminate employment at their own will, either separately or in concert; that to enforce their claims for better wages and working conditions, they had a right to refuse to buy goods from their employer or anybody else; that what they could do to aid their cause, they had a right to persuade others to do;

and that the Anti-trust laws designed to regulate trading were unsuitable to regulate employer-employee relations and controversies. The claim was that the history of the legislation supported this line of argument.[3]

The contrary viewpoint was that the Act covered all classes of people and all types of combinations, including unions, if their activities even physically interrupted the free flow of trade or tended to create business monopolies, and that a combination of laborers to obtain a raise in wages was itself a prohibited monopoly. Federal courts adopted the latter view and soon applied the law to unions in a number of cases.[4] Injunctions were used to enforce the Act against unions. At the same time, employers invoked injunctions to restrain labor union activities even where no violation of the Sherman Act was charged.

Vigorous protests arose from employee groups. The unions urged congressional relief from what they considered to be two separate, but partially overlapping evils— application of the Sherman Act to unions, and issuance of injunctions against strikes, boycotts and other labor union weapons. Numerous bills to curb injunctions were

---

[3] For a comprehensive discussion of the history of the Sherman Act, see 51 Cong. Rec. 13661–13668, 63rd Cong., 2nd Sess. And see *ibid.*, 13969–13971, 14013–14016, 14020–14023. See also Berman, Labor and The Sherman Act (1930), pp. 1–98; Mason, Organized Labor and The Law, Chapters 7 & 8; Gompers, "The Sherman Law. Amend It or End It," American Federationist, Vol. 17, No. 3, March, 1910, pp. 197, 202. For prior discussions in this Court of the dominant concern of Congress to protect consumers from business combinations, see *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S. 290; *Standard Oil Co.* v. *United States*, 221 U. S. 1; *Apex Hosiery Co.* v. *Leader*, 310 U. S. 469; *United States* v. *Underwriters' Assn.*, 322 U. S. 533.

[4] See note 3, *supra.* See also 51 Cong. Rec. 9068–9077; 9081–9091; *United States* v. *Amalgamated Council*, 54 F. 994 (1893); *Waterhouse* v. *Comer*, 55 F. 149 (1893); *United States* v. *Debs*, 64 F. 724 (1894); *Loewe* v. *Lawlor*, 208 U. S. 274, 235 U. S. 522. And see Appendix to Berman, *op. cit., supra.*

offered. Other proposed legislation was intended to take labor unions wholly outside any possible application of the Sherman Act. All of this is a part of the well known history of the era between 1890 and 1914.[5]

To amend, supplement and strengthen the Sherman Act against monopolistic business practices, and in response to the complaints of the unions against injunctions and application of the Act to them, Congress in 1914 passed the Clayton Act.[6] Elimination of those "trade practices" which injuriously affected competition was its first objective.[7] Each section of the measure prohibiting such trade practices contained language peculiarly appropriate to commercial transactions as distinguished from labor union activities, but there is no record indication in anything that was said or done in its passage which indicates that those engaged in business could escape its or the Sherman Act's prohibitions by obtaining the help of labor unions or others. That this bill was intended to make it all the more certain that competition should be the rule in all commercial transactions is clear from its language and history.

In its treatment of labor unions and their activities the Clayton Act pointed in an opposite direction. Congress in that Act responded to the prolonged complaints[8] concerning application of the Sherman law to labor groups by adopting § 6;[9] for this purpose, and also drastically to

---

[5] See authorities cited in footnotes 3 and 4, *supra*. And see Frankfurter and Greene, The Labor Injunction (1930); Berman, *op. cit. supra*, pp. 99–117.

[6] 38 Stat. 730.

[7] Senate Report No. 698, 63rd Cong., 2nd Sess.

[8] *Ibid.*, 10–12.

[9] Section 6 reads as follows: "That the labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for

restrict the general power of federal courts to issue labor injunctions, § 20[10] was adopted. Section 6 declared that labor was neither a commodity nor an article of commerce, and that the Sherman Act should not be "construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help . . ." Section 20 limited the power of courts to issue injunctions in a case "involving or growing out of a labor dispute over terms or conditions of employment . . ." It declared that no restraining order or injunction should prohibit certain specified acts, and further declared that no one of these specified acts should be "held to be violations of any law of the United States." This Act was broadly proclaimed by many as labor's "Magna Carta," wholly exempting labor from any possible inclu-

the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws."

[10] Section 20 reads in part as follows: "And no such restraining order or injunction shall prohibit any person or persons, whether singly or in concert, from terminating any relation of employment, or from ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means so to do; or from attending at any place where any such person or persons may lawfully be, for the purpose of peacefully obtaining or communicating information, or from peacefully persuading any person to work or to abstain from working; or from ceasing to patronize or to employ any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means so to do; or from paying or giving to, or withholding from, any person engaged in such dispute, any strike benefits or other moneys or things of value; or from peaceably assembling in a lawful manner, and for lawful purposes; or from doing any act or thing which might lawfully be done in the absence of such dispute by any party thereto; nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States."

sion in the Anti-trust legislation; others, however, strongly denied this.

This Court later declined to interpret the Clayton Act as manifesting a congressional purpose wholly to exempt labor unions from the Sherman Act. *Duplex Co.* v. *Deering,* 254 U. S. 443; *Bedford Cut Stone Co.* v. *Journeymen Stone Cutters' Assn.,* 274 U. S. 37. In those cases labor unions had engaged in a secondary boycott; they had boycotted dealers, by whom the union members were not employed, because those dealers insisted on selling goods produced by the employers with whom the unions had an existing controversy over terms and conditions of employment. This Court held that the Clayton Act exempted labor union activities only insofar as those activities were directed against the employees' immediate employers and that controversies over the sale of goods by other dealers did not constitute "labor disputes" within the meaning of the Clayton Act.

Again the unions went to Congress. They protested against this Court's interpretation, repeating the arguments they had made against application of the Sherman Act to them. Congress adopted their viewpoint, at least in large part, and in order to escape the effect of the *Duplex* and *Bedford* decisions,[11] passed the Norris-LaGuardia Act, 47 Stat. 70. That Act greatly broadened the meaning this Court had attributed to the words "labor dispute," further restricted the use of injunctions in such a dispute, and emphasized the public importance under modern economic conditions of protecting the rights of employees to organize into unions and to engage in "concerted activities for the purpose of collective bargaining or other mutual aid and protection." This congressional purpose found further expression in the Wagner Act, 49 Stat. 449.

[11] *Milk Wagon Drivers' Union* v. *Lake Valley Farm Products,* 311 U. S. 91; *New Negro Alliance* v. *Sanitary Grocery Co.,* 303 U. S. 552.

We said in *Apex Hosiery Co.* v. *Leader, supra,* 488, that labor unions are still subject to the Sherman Act to "some extent not defined." The opinion in that case, however, went on to explain that the Sherman Act "was enacted in the era of 'trusts' and of 'combinations' of businesses and of capital organized and directed to control of the market by suppression of competition in the marketing of goods and services, the monopolistic tendency of which had become a matter of public concern"; that its purpose was to protect consumers from monopoly prices, and not to serve as a comprehensive code to regulate and police all kinds and types of interruptions and obstructions to the flow of trade. This was a recognition of the fact that Congress had accepted the arguments made continuously since 1890 by groups opposing application of the Sherman Act to unions. It was an interpretation commanded by a fair consideration of the full history of Anti-trust and labor legislation.

*United States* v. *Hutcheson,* 312 U. S. 219, declared that the Sherman, Clayton and Norris-LaGuardia Acts must be jointly considered in arriving at a conclusion as to whether labor union activities run counter to the Anti-trust legislation. Conduct which they permit is not to be declared a violation of federal law. That decision held that the doctrine of the *Duplex* and *Bedford* cases was inconsistent with the congressional policy set out in the three "interlacing statutes."

The result of all this is that we have two declared congressional policies which it is our responsibility to try to reconcile. The one seeks to preserve a competitive business economy; the other to preserve the rights of labor to organize to better its conditions through the agency of collective bargaining. We must determine here how far Congress intended activities under one of these policies to neutralize the results envisioned by the other.

Aside from the fact that the labor union here acted in combination with the contractors and manufacturers, the means it adopted to contribute to the combination's purpose fall squarely within the "specified acts" declared by § 20 not to be violations of federal law.[12] For the union's contribution to the trade boycott was accomplished through threats that unless their employers bought their goods from local manufacturers the union laborers would terminate the "relation of employment" with them and cease to perform "work or labor" for them; and through their "recommending, advising, or persuading others by peaceful and lawful means" not to "patronize" sellers of the boycotted electrical equipment. Consequently, under our holdings in the *Hutcheson* case and other cases which followed it,[13] had there been no union-contractor-manufacturer combination the union's actions here, coming as they did within the exemptions of the Clayton and Norris-LaGuardia Acts, would not have been violations of the Sherman Act. We pass to the question of whether unions can with impunity aid and abet business men who are violating the Act.

On two occasions this Court has held that the Sherman Act was violated by a combination of labor unions and business men to restrain trade.[14] In neither of them was

[12] It has been argued that no labor disputes existed. The argument is untenable. We do not have here, as we did in *Columbia River Packers Assn.* v. *Hinton,* 315 U. S. 143, a dispute between groups of business men revolving solely around the price at which one group would sell commodities to another group. On the contrary, Local No. 3 is a labor union and its spur to action related to wages and working conditions.

[13] *United States* v. *Building Trades Council,* 313 U. S. 539; *United States* v. *Brotherhood of Carpenters,* 313 U. S. 539; *United States* v. *Hod Carriers Council,* 313 U. S. 539; *United States* v. *Federation of Musicians,* 318 U. S. 741.

[14] *United States* v. *Brims,* 272 U. S. 549; *Local 167* v. *United States,* 291 U. S. 293.

the Court's attention sharply called to the crucial questions here presented. Furthermore, both were decided before the passage of the Norris-LaGuardia Act and prior to our holding in the *Hutcheson* case. It is correctly argued by respondents that these factors greatly detract from the weight which the two cases might otherwise have in the instant case. See *United States* v. *Hutcheson, supra,* 236. Without regard to these cases, however, we think Congress never intended that unions could, consistently with the Sherman Act, aid non-labor groups to create business monopolies and to control the marketing of goods and services.

Section 6 of the Clayton Act declares that the Sherman Act must not be so construed as to forbid the "existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help . . ." But "the purpose of mutual help" can hardly be thought to cover activities for the purpose of "employer-help" in controlling markets and prices. And in an analogous situation where an agricultural association joined with other groups to control the agricultural market, we said:

"The right of these agricultural producers thus to unite in preparing for market and in marketing their products, and to make the contracts which are necessary for that collaboration, cannot be deemed to authorize any combination or conspiracy *with other persons* in restraint of trade that these producers may see fit to devise." *United States* v. *Borden Co.*, 308 U. S. 188, 204–205. (Italics supplied.)

We have been pointed to no language in any act of Congress or in its reports or debates, nor have we found any, which indicates that it was ever suggested, considered, or legislatively determined that labor unions should be granted an immunity such as is sought in the present case. It has been argued that this immunity can be inferred

from a union's right to make bargaining agreements with its employer. Since union members can without violating the Sherman Act strike to enforce a union boycott of goods, it is said they may settle the strike by getting their employers to agree to refuse to buy the goods. Employers and the union did here make bargaining agreements in which the employers agreed not to buy goods manufactured by companies which did not employ the members of Local No. 3. We may assume that such an agreement standing alone would not have violated the Sherman Act. But it did not stand alone. It was but one element in a far larger program in which contractors and manufacturers united with one another to monopolize all the business in New York City, to bar all other business men from that area, and to charge the public prices above a competitive level. It is true that victory of the union in its disputes, even had the union acted alone, might have added to the cost of goods, or might have resulted in individual refusals of all of their employers to buy electrical equipment not made by Local No. 3. So far as the union might have achieved this result acting alone, it would have been the natural consequence of labor union activities exempted by the Clayton Act from the coverage of the Sherman Act. *Apex Hosiery Co.* v. *Leader, supra,* 503. But when the unions participated with a combination of business men who had complete power to eliminate all competition among themselves and to prevent all competition from others, a situation was created not included within the exemptions of the Clayton and Norris-LaGuardia Acts.

It must be remembered that the exemptions granted the unions were special exceptions to a general legislative plan. The primary objective of all the Anti-trust legislation has been to preserve business competition and to proscribe business monopoly. It would be a surprising thing if Congress, in order to prevent a misapplication of that legislation to labor unions, had bestowed upon

such unions complete and unreviewable authority to aid business groups to frustrate its primary objective. For if business groups, by combining with labor unions, can fix prices and divide up markets, it was little more than a futile gesture for Congress to prohibit price fixing by business groups themselves. Seldom, if ever, has it been claimed before, that by permitting labor unions to carry on their own activities, Congress intended completely to abdicate its constitutional power to regulate interstate commerce and to empower interested business groups to shift our society from a competitive to a monopolistic economy. Finding no purpose of Congress to immunize labor unions who aid and abet manufacturers and traders in violating the Sherman Act, we hold that the district court correctly concluded that the respondents had violated the Act.

Our holding means that the same labor union activities may or may not be in violation of the Sherman Act, dependent upon whether the union acts alone or in combination with business groups. This, it is argued, brings about a wholly undesirable result—one which leaves labor unions free to engage in conduct which restrains trade. But the desirability of such an exemption of labor unions is a question for the determination of Congress. *Apex Hosiery Co.* v. *Leader, supra.* It is true that many labor union activities do substantially interrupt the course of trade and that these activities, lifted out of the prohibitions of the Sherman Act, include substantially all, if not all, of the normal peaceful activities of labor unions. It is also true that the Sherman Act "draws no distinction between the restraints effected by violence and those achieved by peaceful . . . means," *Apex Hosiery Co.* v. *Leader, supra,* 513, and that a union's exemption from the Sherman Act is not to be determined by a judicial "judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of

which the particular union activities are the means." *United States* v. *Hutcheson, supra,* 232. Thus, these congressionally permitted union activities may restrain trade in and of themselves. There is no denying the fact that many of them do so, both directly and indirectly. Congress evidently concluded, however, that the chief objective of Anti-trust legislation, preservation of business competition, could be accomplished by applying the legislation primarily only to those business groups which are directly interested in destroying competition. The difficulty of drawing legislation primarily aimed at trusts and monopolies so that it could also be applied to labor organizations without impairing the collective bargaining and related rights of those organizations has been emphasized both by congressional and judicial attempts to draw lines between permissible and prohibited union activities. There is, however, one line which we can draw with assurance that we follow the congressional purpose. We know that Congress feared the concentrated power of business organizations to dominate markets and prices. It intended to outlaw business monopolies. A business monopoly is no less such because a union participates, and such participation is a violation of the Act.

This brings us to a consideration of the scope of the declaratory judgment and the injunction granted by the district court. We cannot sustain the judgment or the injunction in the form in which they were entered. The judgment and the injunction apply only to the union, its members, and its agents, since they were the only parties against whom relief was asked. The judgment declared that "the combination and conspiracy and the acts done and being done in furtherance thereof all as set forth in the findings of fact herein are unlawful and contrary to the . . . Sherman Anti-Trust Law, as amended and supplemented." There were 374 find-

ings of fact which cover 111 pages of the printed record. These findings were made from 25,000 pages of evidence. The declaratory judgment, which was the foundation for the injunction, is thus almost the equivalent of a statement that each fact "as set forth in the 374 findings" constituted a violation of the Sherman Act. And when we turn to the sweeping commands of the injunction, we find that its terms, directed against the union and its agents alone, restrained the union, even though not acting in concert with the manufacturers, from doing the very things that the Clayton Act specifically permits unions to do. We agree with the following statement of the Circuit Court of Appeals:

"Indeed, the injunction is so far contrary to the statute that its mandate might well have been stated in the converse of the terms of the Clayton Act, § 20, viz., as restraining Local 3 and its officers 'from terminating any relation of employment, or from ceasing to perform any work or labor . . . or from ceasing to patronize . . . any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means so to do.' 29 U. S. C. A., § 52, *supra.* And the vague scope of the declaratory judgment is even more indefinitely inclusive, in terms reaching all the activities of the defendant set forth in the findings."

Respondents objected to the form of the injunction and specifically requested that it be amended so as to enjoin only those prohibited activities in which the union engaged in combination "with any person, firm or corporation which is a non-labor group . . ." Without such a limitation, the injunction as issued runs directly counter to the Clayton and the Norris-LaGuardia Acts. The district court's refusal so to limit it was error.

The judgment of the Circuit Court of Appeals ordering the action dismissed is accordingly reversed and the cause is remanded to the district court for modification and clari-

fication of the judgment and injunction, consistent with this opinion.

*Reversed and remanded.*

Mr. Justice Roberts.

While I should reverse the judgment, I am unable to concur in the court's opinion.  I think it conveys an incorrect impression of the genesis and character of the conspiracy charged in the complaint, and misapplies recent decisions of the court.

There is no doubt that the programme adopted by Local No. 3 envisaged the exclusion, from the entire New York City area, of any electrical workers, whether engaged in manufacturing or installing electrical devices and equipment, except members of the Local.  The organization from time to time increased the classes of members, so as to add to its original membership of workers engaged in fabricating and installing electrical devices, equipment, and apparatus the additional categories of shop employes engaged in manufacturing electrical equipment and all workers employed in alterations, additions, and repairs involving electrical equipment.  It succeeded in unionizing and imposing closed shops employing only members of Local 3, not only on all building contractors, but on all repair contractors and their establishments and all manufacturers of electrical equipment.  Membership in the union was closely restricted and the campaign eventuated in a situation where no electrical work could be done by persons other than members of the union, no building construction could be done by other than union men, no matter what their trade, and no manufactured electrical appliance or apparatus could be installed in the New York area without the consent of Local No. 3.  That consent was given only if the device, appliance or apparatus was manufactured, or work done on it, by members of the Local.  Complicated apparatus which had to be manufac-

tured outside New York City, because no establishment making it existed within the city, had to be dismantled and rebuilt by members of the Local before it could be used in the New York area.

It is true that before Local No. 3 obtained this complete control of the industry in its area of operation certain associated building contractors dealt jointly as an association with the union. As respects certain manufacturers which came under the dominance of the union this is not true. Nor is it true of repair businesses. On the contrary, it is the fact that each one of these was individually coerced by the union's power to agree to its terms. It is, therefore, inaccurate to say that the employers used the union to aid and abet them to restrain interstate commerce. Some of the employers, notably the building contractors, did jointly cooperate with the union; other sorts of employers were forced individually to comply with the union's demands, until all of them had succumbed.

There can be no question of the purpose of the union. It was to exclude from use in the City of New York articles of commerce made outside the city and offered for sale to users within the city; it was completely to monopolize the manufacture and sale of all electrical equipment and devices within New York, and to exclude from use in the area every such article manufactured outside the city, whether in a closed union shop or not. The results of this programme are obvious. Interstate commerce between New York City and manufacturers having establishments outside the city was completely broken off, and the monopoly created raised, standardized and fixed the prices of merchandise and apparatus.

As I understand the opinion of the court, such a programme, and such a result, is wholly within the law provided only that employers do not jointly agree to comply with the union's demands. Unless I misread the opinion, the union is at liberty to impose every term and

condition as shown by the record in this case and to enforce those conditions and procure an agreement from each employer to such conditions by calling strikes, by lockout, and boycott, provided only such employer agrees for himself alone and not in concert with any other.

I point out again, as respects certain employers here concerned, that that is the situation, whereas, with respect to the building construction employers, there was mutual agreement with the union. But the opinion takes no note of the distinction in fact. It seems to me that the law as announced by the court creates an impossible situation such as Congress never contemplated and leaves commerce paralyzed beyond escape.

Until *Apex Hosiery Co.* v. *Leader*, 310 U. S. 469, was decided I had thought that a conspiracy by laborers to interrupt the free flow of commerce was a violation of the Sherman Act. That case, however, announced a narrower doctrine. Its teaching is that only activity of labor which harms the commercial competitive system through raising prices, restricting production, or otherwise controlling the market, falls within the proscription of the Sherman Act. In that case it was said:

"Furthermore, successful union activity, as for example consummation of a wage agreement with employers, may have some influence on price competition by eliminating that part of such competition which is based on differences in labor standards. Since, in order to render a labor combination effective it must eliminate the competition from non-union made goods, see *American Steel Foundries* v. *Tri-City Central Trades Council*, 257 U. S. 184, 209, an elimination of price competition based on differences in labor standards is the objective of any national labor organization. But this effect on competition has not been considered to be the kind of curtailment of price competition prohibited by the Sherman Act."

It was added that the restraint there under examination was not shown "to have any actual or intended effect on price or price competition." The decision indicated that, in some undefined circumstances, labor organizations might be subject to the statute.

In *United States* v. *Hutcheson,* 312 U. S. 219, secondary boycotts by labor unions to keep out of the market non-union goods, or goods worked on by other unions, were held immune from liability, civil or criminal, under the Sherman Act. It was there said:

"So long as a union acts in its self-interest and does not combine with non-labor groups, the licit and the illicit under § 20 are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means."

Thus, although a conspiracy between laborers is distinguished from one between them and employers, it is intimated, as I think, that a purpose on the part of a labor group to harm the commercial competitive system, to raise prices, to restrict production, or otherwise control the market, would not render the concerted action illegal, provided only that no employer participated. The reservation made in the *Apex* case was discarded in the *Hutcheson* case. This advance in the law was emphasized in *United States* v. *Building Trades Council,* 313 U. S. 539, and *United States* v. *Brotherhood of Carpenters,* 313 U. S. 539, but the court went even farther, in *United States* v. *Federation of Musicians,* 318 U. S. 741, and, as I think, rendered a decision contrary to that now announced. There a motion to dismiss a bill of complaint was granted and this court sustained that action. The complaint charged a conspiracy by the American Federation of Musicians, a nationwide organization, and its officers, to obtain employment for its members by eliminating entirely from interstate commerce all phonograph records

and electrical transcriptions of music and eliminating all competition between transcribed music and that produced by living musicians. The conspiracy charged was absolutely to prevent manufacture or sale of phonograph records and electrical transcriptions; to eliminate from the market all manufacturers, distributors, jobbers or retailers of the same, and to prevent the use of the articles, either in public places or private homes, and, of course, to prevent their sale. In the bill it was charged that the conspiracy did not grow out of or involve any dispute concerning terms or conditions of employment; that the purpose of the conspiracy was to eliminate from the market, manufacture, sale and use of mechanical recordings and records and transcriptions unless the persons engaged in this business should enter into agreements with the union, hiring useless and unnecessary labor, as the union would demand. The further purpose of the conspiracy charged was to exclude from the market competition by anyone who failed exclusively to employ members of the union. The complaint further charged that the purpose and effect of the conspiracy was unlawfully to destroy all manufacture and sale, in interstate commerce, of phonograph records and electrical transcriptions, eliminate all competition between music produced by mechanical means and music produced by living musicians, to deprive the public of an inexpensive means of entertainment in public places and in the home.

This court's affirmance of the dismissal of this complaint can only mean that every businessman who desires to stay in business must, if a union so demands, enter into an agreement with the union eliminating certain articles from his manufacture, from his sales, or from his use. The decision must necessarily mean that it would not be unlawful to enter into such an agreement with the union, otherwise we should have the anomaly that the union's demand for such an agreement is impeccable but the em-

ployer's acquiescence is unlawful. As shown by the opinion of the District Court in that case (47 F. Supp. 304) the Government contended that the union's effort represented "an attempt by the union to force employers to combine with it for the purpose of restraining interstate trade . . ." The District Court shortly answered this contention (p. 309) by saying: "In the court's opinion, *United States* v. *Brims*, 272 U. S. 549, . . . and like cases, are not pertinent." This must mean that each employer, in the instant case, is at liberty to agree with the union on all the terms and conditions which create a complete monopoly, a complete boycott, a complete closing of the market, and a serious price fixing affecting competitive commercial transactions. This is what I understand the court now holds. This is what was accomplished with impunity by the Federation of Musicians. But the situation created by such a holding is unreal.

As I have pointed out, in two branches of the industry, the manufacturers and employers, one by one, succumbed to union pressure and entered into agreements. Was not such an action, in each instance, a conspiracy? Are more than two parties required to conspire, and did not each of those conspiracies, to some extent, hinder and restrain interstate commerce and affect the market and the competitive price situation? As each agreement was consummated the market was, to that extent, closed and the boycott against out-of-the-city manufactures tightened.

But more. The union did not conduct its campaign in a corner. Albeit the findings are that manufacturers and repairers of electrical appliances violently resisted the unionization of their businesses, they, one by one, surrendered and signed. In doing so, many must have had knowledge of what others were doing or had done. And, as the coverage became complete, each one was enabled to stifle out-of-town competition and to raise prices. In any action against them and the union charging conspiracy, it

would be urged that a conspiracy need not consist of a written or verbal agreement but might be inferred from similarity of action. And it would be little protection to the employers concerned that, in each instance, a separate agreement was signed between union and employer.

The course of decision in this court has now created a situation in which, by concerted action, unions may set up a wall around a municipality of millions of inhabitants against importation of any goods if the union is careful to make separate contracts with each employer, and if union and employers are able to convince the court that, while all employers have such agreements, each acted independently in making them,—this notwithstanding the avowed purpose to exclude goods not made in that city by the members of the union; notwithstanding the fact that the purpose and inevitable result is the stifling of competition in interstate trade and the creation of a monopoly.

The only answer I find in the opinion of the court is that Congress has so provided. I think it has not provided any such thing and that the figmentary difference between employers negotiating jointly with the only union with which they can deal,—which imposes like conditions on all employers—and each employer dealing separately with the same union is unrealistic and unworkable. And the language of § 20 of the Clayton Act makes no such distinction.

This court, as a result of its past decisions, is in the predicament that whatever it decides must entail disastrous results. I can understand that the Circuit Court of Appeals felt constrained by the prior decisions of this court to order the judgment of the District Court reversed and the action dismissed. If the present decision is, as I think, a retrogression from earlier holdings, I welcome it; if it is but a limitation of them I concur in the partial

alleviation of an impossible situation. But I would not limit the injunction as the opinion directs.

MR. JUSTICE MURPHY, dissenting.

My disagreement with the Court rests not so much with the legal principles announced as with the application of those principles to the facts of the case.

If the union in this instance had acted alone in its self-interest, resulting in a restraint of interstate trade, the Sherman Act concededly would be inapplicable. But if the union had aided and abetted manufacturers or traders in violating the Act, the union's statutory immunity would disappear. I cannot agree, however, that the circumstances of this case demand the invocation of the latter rule.

The union here has not in any true sense "aided" or "abetted" a primary violation of the Act by the employers. In the words of the union, it has been "the dynamic force which has driven the employer-group to enter into agreements" whereby trade has been affected. The fact that the union has expressed its self-interest with the aid of others rather than solely by its own activities should not be decisive of statutory liability. What is legal if done alone should not become illegal if done with the assistance of others and with the same purpose in mind. Otherwise a premium of unlawfulness is placed on collective bargaining.

Had the employers embarked upon a course of unreasonable trade restraints and had they sought to immunize themselves from the Sherman Act by using the union as a shield for their nefarious practices, we would have quite a different case. The union then could not be said to be acting in its self-interest in combining with the employers to carry out trade restraints primarily for the employers' interests, even though incidental benefits might accrue to the union. Under such conditions the union fairly could

be said to be aiding and abetting a violation of the Act and its immunity would be lost. The facts of this case, however, do not allow such conclusions to be drawn.

I would therefore affirm the judgment of the court below.