**REPUBLIC PRODUCTIONS, INC., a corporation, et al., Plaintiffs,**

v.

**AMERICAN FEDERATION OF MUSICIANS OF the UNITED STATES AND CANADA, an unincorporated association, et al., Defendants.**

United States District Court
S. D. New York.

July 15, 1965.

See also D.C., 30 F.R.D. 159.

Baer, Marks, Friedman & Berliner, New York City, for plaintiffs; Leonard L. Berliner, Seymour Shainswit, Melvin D. Kraft, New York City, of counsel.

Poletti, Freidin, Prashker & Gartner, New York City, for defendants American Federation of Musicians of United States and Canada, Leo Cluesmann, C. L. Bagley and Herman Kenin; Murray Gartner, Richard H. Borow, New York City, of counsel.

Satterlee, Warfield & Stephens, New York City, for defendant Samuel R. Rosenbaum, as trustee; F. W. H. Adams, Henry J. Formon, Jr., New York City, of counsel.

McLEAN, District Judge.

This is a private treble damage antitrust action, begun in the United States District Court for the Southern District of California, Central Division, in 1957, transferred in 1958 to this court pursuant to 28 U.S.C. § 1404(a), and tried in this court in 1964.

Plaintiffs are employers.[1] Defendants are a union, the members of its Executive Board, and the trustee of a trust created pursuant to certain labor agreements between the employers and the union. Only three members of the Executive Board, defendants Bagley, Cluesmann, and Kenin, have been served. The union was the duly recognized collective bargaining representative of all musicians employed by plaintiff. The events which gave rise to this action occurred in the years 1946 to 1956, in the heyday of the reign of James C. Petrillo as the czar of professional musicians in this country.

The complaint charges that defendants combined and conspired to restrain and monopolize interstate commerce in the distribution and licensing of motion pictures for exhibition on television, and that defendants have restrained and monopolized such commerce, all in violation of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2). The question is whether plaintiffs have proved a right to relief. The answer to the question turns upon (1) whether or not the acts of defendants are immunized from the reach of the antitrust laws by reason of Sections 6 and 20 of the Clayton Act (15 U.S.C. § 17, 29 U.S.C. § 52), and the Norris-La Guardia Act (29 U.S.C. § 101 et seq.), (2) if they are not immune, do they amount to a violation of the Sherman Act?[2]

---

1. Republic Productions, Inc. ("Productions") and Hollywood Television Service, Inc. ("Hollywood"), were wholly owned subsidiaries of Republic Pictures Corporation ("Pictures"). As a practical matter, the three corporations may be treated as one for the purposes of this case. They are frequently referred to in this opinion in the singular, as plaintiff.

2. In the pre-trial order, I stated the issues to be tried with respect to Sections 6 and 20 of the Clayton Act and the Norris-La Guardia Act in terms of whether or not those statutes deprived the court

Detailed findings of fact and conclusions of law are filed herewith. The purpose of this opinion is to set forth briefly the reasons which have led me to my conclusion. I will first consider whether the acts of the union come within the scope of the antitrust exemption afforded by the Clayton Act and the Norris-La Guardia Act.

In the collective bargaining negotiations in 1946 between the union and the eight major producers of motion pictures, including plaintiff, the union insisted on a clause which prohibited the producers, in effect, from selling their motion pictures for exhibition on television without the union's consent.[3] The prohibition applied to pictures already produced as well as to those to be produced in the future. The union's insistence on this clause was emphasized by a threat to strike if the clause were not accepted by the employers. The employers were unwilling to endure a strike. Consequently, they agreed to the clause. The collective bargaining agreements executed by the parties in subsequent years contained the clause without change.

I have found that in making this demand the union acted in what it believed to be the best interests of its members. Television was new. No one could foresee exactly what its effect would prove to be upon employment opportunities for musicians, but it was reasonable to believe that the exhibition on television of motion pictures, both old and new, which contained recorded music, might well reduce the demand for the employment of musicians to produce "live" music for television performances.

Shortly before this, the union had been faced with a similar problem with respect to phonograph records, another form of "canned" music. Its efforts to prevent radio stations from broadcasting records, efforts which included a strike, had resulted in a suit by the United States to enjoin the union's activities as being in violation of the Sherman Act. This litigation had terminated in 1943 in favor of the union. The courts had held that the union's activities were immune under the Clayton Act and the Norris-La Guardia Act. United States v. American Federation of Musicians, 47 F.Supp. 304 (N.D.Ill.1942), aff'd, 318 U.S. 741, 63 S. Ct. 665, 87 L.Ed. 1120 (1943).

In 1948 there was another strike in the phonograph record industry which finally terminated in an agreement by the record manufacturers to make certain periodic payments into a trust fund, of which defendant Rosenbaum was trustee. It was his duty to expend these moneys to hire musicians to give concerts to which the public was admitted without charge.

Having thus found a satisfactory solution of the phonograph record problem, the union proceeded to turn its attention to television. In 1950 it entered into labor agreements with producers of new film designed expressly for exhibition on television in the first instance ("television film"). These producers also agreed to make payments into a trust fund of which defendant Rosenbaum was trustee, a fund similar in purpose and operation to the phonograph record trust fund. Having accomplished this, the union then was ready to announce the terms upon

of jurisdiction of this action. Counsel for defendants understandably followed this formula in making their motions to dismiss. I am satisfied, however, after further reflection, that even though the Norris-La Guardia Act (29 U.S.C. § 101) provides that the court shall not "have jurisdiction" to issue an injunction in a case involving a labor dispute, the court nevertheless does have jurisdiction of this action for damages, and that it is therefore more accurate to phrase the issue in terms of whether or not plaintiff has

proved a cause of action, i.e., a right to relief.

3. Literally, the restriction related only to sound tracks, not to the motion pictures of which the sound tracks were a part. Plaintiff, however, could not remove the sound tracks from the films, that is, it could not separate the sound track containing the music from that containing the dialogue. As a practical matter, therefore, as applied to plaintiff, the clause prevented the exhibition of the entire motion picture on television.

which it would permit the exhibition on television of motion pictures designed primarily for exhibition in theaters ("Hollywood film"), the type of motion pictures which plaintiff produced. In 1951 plaintiff entered into a labor agreement with the union and a trust agreement with Rosenbaum as trustee which followed the pattern previously established with respect to the phonograph record manufacturers and the producers of television film. Subsequently, the distributors, to whom the other major producers of Hollywood film had assigned television rights, made similar agreements with the union and with Rosenbaum as trustee.

The labor agreement between plaintiff and the union and the trust agreement with Rosenbaum made in 1951 were renewed, with some changes, in subsequent years. The agreements benefitted professional musicians in general, substantially all of whom were members of the union. Musicians were compensated by Rosenbaum out of the trust fund for performing at the public concerts which the trust agreement contemplated. The benefit to the particular musicians who were currently employed by plaintiff, however, was nominal at best, and after a short period, for all practical purposes, non-existent. Although at the outset in 1951 plaintiff agreed in the labor agreement to employ musicians to make a new sound track for its old motion pictures (despite the fact that the old sound track was not only usable but in fact had to be used, since it could not be detached from the film), this practice was soon abandoned. Thereafter plaintiff agreed to make payments to the musicians whom plaintiff had originally employed in making the old motion pictures in the first instance, regardless of whether they were still in plaintiff's employ. If these musicians could not be located, as was often the case, the payments were to be made instead into the Rosenbaum trust fund.[4] In addition to these payments made pursuant to the labor agreement, plaintiff also paid to Rosenbaum, pursuant to the trust agreement, a percentage of the revenue derived by plaintiff from the exhibition of its pictures on television.

We thus have this situation: (1) the union accomplished its end without any strike, without any picketing, boycotting, violence or any other overt act. The mere implied threat of a strike was sufficient to produce an agreement on the part of plaintiff and the other employers; (2) the end that was accomplished was of benefit to union members in general but of little or no benefit to those particular members who were currently employed by plaintiff. Does this conduct fall within the labor exemption of the Clayton Act and the Norris-La Guardia Act?

Section 6 of the Clayton Act (15 U.S.C. § 17) provides that "[t]he labor of a human being is not a commodity or article of commerce." It provides further that:

"Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor * * * organizations * * or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof * * *."

Section 20 of the Clayton Act (29 U.S.C. § 52) provides that no injunction shall be granted in any case growing out of "a dispute concerning terms or conditions of employment," except in certain limited circumstances inapplicable here. It provides further that no injunction shall prohibit any person from doing a number of specified acts, i. e., "terminating any relation of employment," etc., and that none of these specified acts shall "be considered or held to be violations of any law of the United States."

Section 1 of the Norris-La Guardia Act (29 U.S.C. § 101) provides that no court shall have jurisdiction to issue any injunction "in a case involving or growing out of a labor dispute," except in circumstances not material here. "Labor dispute" is defined in Section 13 of the Act

---

4. Payments were also made to Local 47, apparently for the musicians' account.

(29 U.S.C. § 113) to include "any controversy concerning terms or conditions of employment \* \* \* regardless of whether or not the disputants stand in the proximate relation of employer and employee."

■ These statutes are to be construed together to effectuate the broad purpose of Congress to protect the rights of labor. United States v. Hutcheson, 312 U. S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941).

These statutes have been interpreted in a long line of Supreme Court decisions, stretching from Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940), and United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463 (1941), decided in 1940 and 1941, to United Mine Workers of America v. Pennington, 85 S.Ct. 1585, 14 L.Ed.2d 626 and Local Union No. 189, Amalgamated Meat Cutters, etc. v. Jewel Tea Company, 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 decided on June 7, 1965.[5] As is to be expected, none of these cases is precisely like this one. These cases do, however, clear the ground to a considerable extent and enable us to narrow still further the precise point which must be decided here.

In the first place, it is clear that we do not have here the situation presented in Allen Bradley Co. v. Local Union No. 3, IBEW, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), i. e., participation by a union in a combination of businessmen formed to monopolize commerce, to eliminate competition between themselves, and to prevent competition by other businessmen. There is no evidence that the union conspired with one group of producers to injure another group. All that we are dealing with here is the collective bargaining agreement, first made in 1946 and repeated in subsequent years, between the union on the one hand and the eight major producers, bargaining together, on the other hand, which prevented exhibition of pictures on television without the union's consent, and the labor and trust agreements, first made in 1951 and repeated, with variations, in subsequent years, between the union or the trustee, respectively, on the one hand and plaintiff alone on the other hand, which set forth the terms upon which the union granted its consent. Each producer, or his assignee, in case he had assigned the television rights, entered separately into a labor agreement with the union and a trust agreement with Rosenbaum which were similar to those which plaintiff had made. The union extended the same terms to everyone, and its terms were always accepted.

In the second place, it is equally clear that if in 1946 the union had called a strike of all its members then employed by the eight major producers in order to compel the producers to accept the clause of which plaintiff complains, the Clayton Act and the Norris-La Guardia Act would have afforded the union immunity from prosecution under the antitrust laws. United States v. American Federation of Musicians, supra.

This is true under that decision regardless of the fact that the benefit to the particular striking employees would have been nominal, or at best indirect.

No rational distinction can be drawn between a strike to prevent phonograph record manufacturers from selling their product to broadcasting companies for broadcasting over the radio and a strike to prevent motion picture producers from selling their product to television stations for broadcasting over television. And the same result would have followed if in 1951 or thereafter the union had called a strike of plaintiff's employees to compel plaintiff to accept the labor agreement and the trust agreement.

Hence the precise question to be determined is whether the result here should be any different because no strike was necessary, i. e., because both in 1946 and in 1951 and thereafter the union's pro-

---

5. I have deferred filing my opinion in the present case until now, so that I might have the benefit of the latest word of the Supreme Court on the subject in Pennington and Jewel Tea.

posals were accepted by the employers without a strike. It has been suggested in the opinion of the Court (concurred in by three justices) in Pennington that there may be a difference. The Court points out (85 S.Ct. 1585) that Section 20 of the Clayton Act and Section 4 of the Norris-La Guardia Act permit the union, acting alone, to engage in the conduct therein specified without violating the Sherman Act. One such item of conduct is "[c]easing or refusing to perform any work," i. e., striking. But the Court goes on to say (85 S.Ct. at 1589):

"But neither § 20 nor § 4 expressly deals with arrangements or agreements between unions and employers. Neither section tells us whether any or all such arrangements or agreements are barred or permitted by the antitrust laws."

After further discussion the Court concludes that the particular union-employer arrangement or agreement there involved was not within the exemption. But its reason for so holding, as I read the Pennington opinion, was the Allen Bradley principle, i. e., that the union had entered into a conspiracy with large employers to impose a high wage scale upon smaller employers who could not afford to pay it, for the purpose of putting the smaller employers out of business. The Court said (85 S.Ct. at 1591):

"But we think a union forfeits its exemption from the antitrust laws when it is clearly shown that it has agreed with one set of employers to impose a certain wage scale on other bargaining units. One group of employers may not conspire to eliminate competitors from the industry and the union is liable with the employers if it becomes a party to the conspiracy. This is true even though the unions' part in the scheme is an undertaking to secure the same wages, hours or other conditions of employment from the remaining employers in the industry."

That is not the case here. The holding of Pennington, therefore, does not require the conclusion that the agreements made

between the union and plaintiff in this case are outside the scope of the exemption.

Similarly, in Jewel Tea, there is language in the opinion of Mr. Justice White to the effect that an agreement between a union and an employer under certain circumstances may fall outside the exemption.

"The fact that the parties to the agreement are but a single employer and the unions representing its employees does not compel immunity for the agreement." (85 S.Ct. at 1601)

And again (85 S.Ct. at 1602):

"Jewel, for example, need not have bargained about or agreed to a schedule of prices at which its meat would be sold and the union could not legally have insisted that it do so. But if the union had made such a demand Jewel had agreed and the United States or an injured party had challenged the agreement under the antitrust laws, we seriously doubt that either the union or Jewel could claim immunity by reason of the labor exemption, whatever substantive questions of violation there might be."

But the ultimate conclusion of the opinion is that the agreement there involved was covered by the Clayton Act exemption, because the particular clause in question, i. e., store marketing hours, was sufficiently related to wages, hours and working conditions so that the union's successful attempt to secure the employers' agreement to this clause "falls within the protection of the national labor policy and is therefore exempt from the Sherman Act." (85 S.Ct. at 1602) Consequently, the holding of Jewel Tea does not require the conclusion that the agreements in the present case are outside the scope of the exemption.

No case has been found which actually holds that a union-employer agreement, standing alone, is subject to the antitrust laws because it contains certain provisions, whereas a strike to compel the employer to accept that same agreement

containing those same provisions would be immune from antitrust attack. Any such distinction seems illogical. If the national labor policy 'protects a strike called to compel the agreement, one would think that it would also protect the agreement signed after the strike, or the agreement signed without a strike, particularly in view of the congressional policy of encouraging collective bargaining which is expressed in the National Labor Relations Act (29 U.S.C. §§ 151, 157). In Allen Bradley the Supreme Court so indicated. The Court said (325 U.S. at 809, 65 S. Ct. at 1539):

> "Since union members can without violating the Sherman Act strike to enforce a union boycott of goods, it is said they may settle the strike by getting their employers to agree to refuse to buy the goods. Employers and the union did here make bargaining agreements in which the employers agreed not to buy goods manufactured by companies which did not employ the members of Local No. 3. We may assume that such an agreement standing alone would not have violated the Sherman Act. But it did not stand alone."

And in United States v. Carrozzo, 37 F.Supp. 191 (N.D.Ill.1941), aff'd sub nom. United States v. International Hod Carriers, etc., Council, 313 U.S. 539, 61 S.Ct. 839, 85 L.Ed. 1508 (1941), a union sought to prevent contractors in Chicago from using truck mixers to mix concrete. Certain contractors made such agreements under a threat of strike, others refused and strikes were called. The union was indicted for violation of the Sherman Act. Its demurrer to the indictment was sustained. The court held that Sections 6 and 20 of the Clayton Act conferred upon it immunity from antitrust prosecution for such conduct. No distinction was drawn, as far as appears, between the strikes and the agreements signed without a strike.

■ In my opinion, therefore, United States v. American Federation of Musicians, even though it involved a strike to compel an agreement, rather than the agreement itself, is good authority, binding upon me, for the proposition that the union's insistence on the clause prohibiting the showing of plaintiff's pictures for exhibition on television without the union's consent, was within the exemption and hence immune from attack under the antitrust laws. And if the union's insistence on a complete prohibition was immune, it would seem to follow that its later imposition of a price for modifying its total prohibition should also be immune. If a union can with impunity prevent an employer from selling his product in a particular market, it should be able, with equal safety to itself, to permit him to sell it there upon condition that he pay part of the proceeds to the union's members.

■ Furthermore, wholly apart from United States v. American Federation of Musicians, the Supreme Court decisions prior to Pennington and Jewel Tea seem to point to the union's self-interest as the supreme test of antitrust immunity. Some years ago, the Supreme Court in United States v. Hutcheson, 312 U.S. 219, at 232, 61 S.Ct. 463, at 466, (1941), announced the principle, frequently quoted in later decisions, that:

> "So long as a union acts in its self-interest and does not combine with non-labor groups, the licit and the illicit under § 20 are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means."

■■ The "self-interest" of a union and its members has been treated as synonymous with "the legitimate objects" of organized labor. So long as the union acted in its self-interest, it was carrying out its legitimate objects, and so long as it did that, it was exempt from antitrust violation, no matter what a court might think of the rightness or wrongness of its acts.

Thus, in United States v. International Hod Carriers, etc., Council, supra, it

plaintiff is estopped from complaining of the agreements which it signed. Nor is there any need to deal with the affirmative defense of the statute of limitations.

I turn now to the case against defendant Rosenbaum. He is involved in this controversy only because he served as trustee under the Hollywood film trust agreements, as he had previously served under the phonograph record trust agreement and the television film trust agreements. He is named a defendant in this action only as trustee, not individually.

Rosenbaum was not a union official. This court has held, in a case involving the phonograph record trust, that he was not a "representative of * * * employees" within the meaning of Section 302 of the Labor Management Relations Act (29 U.S.C. § 186) which prohibits payments by an employer to a representative of his employees. Shapiro v. Rosenbaum, 171 F.Supp. 875 (S.D.N.Y.1959)

There is no evidence in this case which would justify a contrary conclusion as to his status as trustee of the Hollywood film trusts. It was because he was not connected with the union that he was selected in the first place to be trustee of the phonograph record trust, i. e., to avoid any claim that payments to the trust would violate the Labor Management Relations Act. Having served in that first trust, it was natural that he should be selected to serve in a similar capacity in the similar motion picture trusts. The charge in the complaint that "the selection and designation of defendant Rosenbaum * * * was made and dictated solely by defendant Federation and defendant Rosenbaum was a representative of the members of defendant Federation employed by plaintiff Productions" has not been proved.

Rosenbaum was no more a "representative" of the employer than he was of the union. He did not "represent" anyone. He was a neutral third party in this employer-union controversy, a mere conduit for the transmission of the funds paid by the employer to the musicians who performed the concerts from which the public, presumably, derived entertainment, and from which the members of the musicians' union derived some sort of livelihood. There is no proof that Rosenbaum "conspired" with anyone, either the union or the employer. He took no part in the negotiation of any of the agreements. As far as appears, he simply did the job that he was hired to do, a purely mechanical job, in a sense, the day to day administration of the trust fund.

Since I have held that plaintiff has failed to prove a claim to relief against the union, it necessarily follows that it has failed to prove one against Rosenbaum. As far as the evidence shows, Rosenbaum did nothing apart from the discharge of his duties as trustee under the trust agreement that could be said to be a violation of the antitrust laws. Since the trust arrangement is not open to attack under the antitrust laws, Rosenbaum's actions in the routine carrying out of that arrangement must be equally immune.

Defendant Rosenbaum's motion, couched in very general terms, to strike "all testimony as to relationships and dealings and communications between the Federation and Republic or other parties," is denied. Defendant Rosenbaum rested at the end of plaintiff's case. His motion then made to dismiss the action against him "for failure to make out a prima facie case" is granted. As to defendant union and the individual members of its Executive Board, I conclude on the entire case that, for the reasons I have indicated, they are entitled to judgment in their favor. The Clerk is directed to enter judgment dismissing the action as against all defendants.

This disposes of the issues raised by the complaint and the answers thereto. There remain the issues raised by the counterclaims of defendant Rosenbaum and plaintiff's reply thereto. These issues were severed at the outset of the trial. As to some of them, I have heretofore held that plaintiff is entitled to a jury trial. These issues are set down for trial beginning on November 8, 1965.

So ordered.